THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARTEZ THIGPEN, Defendant-Appellant.

First District (2nd Division)    No. 1—96—3019

Opinion filed June 15, 1999.

30

Michael J. Pelletier and Maria A. Harrigan, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Sari London, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

The defendant, Artez Thigpen, was indicted on two counts of first degree murder and one count of aggravated battery for the September 12, 1993, shooting of Clifton Burks. He was also charged with first degree murder (attempt), aggravated battery with a firearm and two counts of aggravated battery on Anthony Townsend, who received a gunshot wound in the same incident. The codefendant, Tyrone Williams, was tried separately. A jury convicted the defendant of murdering Mr. Burks, and the trial court sentenced the defendant to a term of 75 years' incarceration in the Illinois Department of Corrections.

The defendant contends that his convictions must be reversed because of the following errors, singly or in conjunction. He maintains that: (1) the trial court erred in allowing evidence of another crime; (2) the trial court improperly admitted alleged threats made against a prospective State witness who recanted his testimony; (3) the trial court should not have allowed testimony that a person who viewed a lineup that included the defendant was dead at the time of trial; (4) it was error for the trial court to allow "extensive" testimony about gang life which was not relevant to the question of the defendant's guilt or innocence; and (5) the trial court prejudiced him by showing bias and hostility toward the defense throughout the trial.

## BACKGROUND

The defendant, Artez Thigpen, also known as "Ted," was indicted on two counts of first degree murder and one count of aggravated battery for the September 12, 1993, shooting of Clifton Burks, also known as "Chub." He was also charged with first degree murder (attempt), aggravated battery with a firearm and two counts of aggravated battery on Anthony Townsend, who received a gunshot wound in the same incident. The codefendant, Tyrone Williams, also known as "Baby Ty," was tried separately. A jury convicted the defendant of murdering Mr. Burks and the trial court sentenced the defendant to a term of 75 years' incarceration in the Illinois Department of Corrections.

On the night of September 12, 1993, two men exited a gray car and shot Mr. Burks several times as he stood on a street corner. According to testimony at trial, the gunmen and the victim were in two rival factions of a street gang, the Unknown Vicelords.

The witnesses who testified against the defendant before the grand jury were Regina Goodwin, Terrell Thomas and Anthony Townsend. Ms. Goodwin told the grand jury that on the night of the murder she talked to Mr. Burks about a debt that he owed to her. Then she crossed the street to talk to her friend Terrell Thomas. She said that she then saw two men exit an older model gray car that was parked by the curb. The men walked over to the victim and shot him several times. Ms. Goodwin said that she ran over to Mr. Burks and saw the two assailants get in the car and drive off. Ms. Goodwin said that she knew the defendant from high school and that she had known Mr. Williams, the codefendant, for about a year. She told the grand jury that she picked both men out of lineups.

Detective Gregory Baiocchi was one of the officers who investigated the crime scene the night of the murder. He testified that he spoke to Ms. Goodwin and that she told him the first three letters of the license plate of the gunmen's car were "VJN." A 1981 gray Oldsmobile was found with such a license plate, registered to "Michael Payne." "Michael Payne" was an alias of the defendant.

In his initial statement and before the grand jury, Mr. Townsend related that on the night of September 12, 1993, he was on his way to a convenience store. He saw a car pull up and heard someone say "Hey, that's Baby Ty." He did not know Mr. Williams but had heard of him. As he walked toward the store he dropped his cigarettes. As he stooped to retrieve them, he heard the door of the car slam. He turned around and saw a man brandishing two handguns. Then, hearing gunfire, he ran to take cover in the convenience store. Before he made it to the store he was shot in the foot. Later when he came out he saw Mr. Burks on the ground. He said that he identified the gunman in a lineup.

After his grand jury testimony, Mr. Townsend spoke to Assistant State's Attorney (ASA) John Schmidt. According to ASA Schmidt, Mr. Townsend said that he was afraid and had received threats. Mr. Townsend was given money to relocate, and he left the city for a while. He bought a handgun to protect himself. ASA Anita Alvarez testified that Mr. Townsend said he was afraid for his life

Later, however, both Ms. Goodwin and Mr. Townsend separately went to defense counsel's office and recanted their grand jury testimony under oath. Mr. Thomas was with Ms. Goodwin when she recanted. The trial testimony of Mr. Townsend and Ms. Goodwin was

consistent with their statements to defense counsel. Mr. Thomas was subpoenaed to testify at the trial but could not be located.

Ms. Goodwin told defense counsel that at the time of the murder she was in the entryway of her apartment building with an acquaintance named Terrell (not Terrell Thomas). They heard shots. When they went to the window they saw Mr. Burks on the ground. She went outside later and gave her name to a police officer when requested. She said that the Terrell that she was with that night is in Mississippi somewhere.

A few days later, she said, she and her friend Terrell Thomas were taken to the police station in the middle of the night to view a lineup. The police showed her a photograph of a person and told her to pick that person out of the lineup. She did not identify anyone, however. Ms. Goodwin claims that the police were abusive towards her and that one detective pushed her over her chair, though she was five months pregnant, and left her handcuffed to a wall for periods of time. She says the detective threatened to hold her for 72 hours if she did not cooperate.

A month later Ms. Goodwin and Mr. Thomas were taken back to view another lineup and were again told whom to identify. She talked with an ASA and then went before the grand jury. Ms. Goodwin claims that she was told what to say to the grand jury and that she agreed to say it so she could go home.

Detective Anne Chambers testified that Ms. Goodwin picked the defendant from the second lineup. Detective Chambers also testified that Ms. Goodwin said that she was afraid. The ASA, for her part, denied having told Ms. Goodwin what to say.

At trial, Mr. Townsend testified that on the evening of September 12, 1993, he heard shots as he was walking to a convenience store. He was high at the time. As he ran for cover in the store he was shot in the foot. Two police officers got his name later when he was in the hospital. He denied having seen the gunmen. A few days later he was taken to the police station where, he claims, a police officer (the same one that pushed Ms. Goodwin) beat him. He denied having witnessed the shooting and was beaten again. He said he may have spoken to an ASA afterwards. Like Ms. Goodwin, he claims that he was told what to say before the grand jury. He says that he was told that if he did not cooperate he would be charged with obstruction of justice. ASA Demetrios Kottaras testified that he interviewed Mr. Townsend and that Mr. Townsend was not told what to say.

Mr. Townsend claims that he persuaded ASA Schmidt to give him relocation money, but he used the money to buy drugs. He says that the handgun he bought was not for self-protection, but to commit rob-

beries to support his drug habit. He says that he left the city to avoid pending criminal prosecutions against him. He later pled guilty to possession of cocaine with intent to deliver and unlawful use of a weapon.

Although she was not present at the shooting of Mr. Burks, one of the State's primary witnesses was Eunice Clark. The defense made a motion *in limine* to exclude her testimony as other crimes evidence. The motion was denied. Ms. Clark testified that at the time of trial she was serving a sentence for two attempted murders. At one time she was a member of the Unknown Vicelords street gang. She testified that the defendant and the victim were members of that gang, though in two different factions. The defendant's faction was led by Mr. Williams, and the victim's was led by Willie Lloyd.

Ms. Clark testified that, on September 12, she was waiting at a street corner for a man called Larry. Larry was to deliver some of the defendant's drugs to her for her to sell. After Larry arrived, Willie Lloyd drove up with several companions and asked Larry where the defendant was. Larry said that he did not know. Then Mr. Lloyd beat up Larry and stole the drugs.

Shortly afterwards, Ms. Clark testified, the defendant drove up in a gray car. Furious to learn that his drugs had been stolen, he hit Larry with his gun. Then he took Larry to the hospital. That evening at the same street corner, the defendant said that he would no longer pay extortion money to Willie Lloyd and that, if he wanted to go to war, that was fine because the defendant had people riding with him just like Willie Lloyd did.

The next morning (September 13), Ms. Clark testified, the defendant returned to the street corner and said that he was going to "go against the mob" and sell drugs in competition with Lloyd. Then the defendant left. Later, two teenagers named Stan and Mike got out of a red car that had pulled up to the corner. They said that that spot now belonged to Willie Lloyd and began to sell the drugs that Lloyd had stolen from Larry.

Then, Ms. Clark related, the defendant came back in his car. When he saw Stan and Mike, he kept driving. Later he came back armed along with eight other men. The men surrounded Stan and Mike and forced them into the car at gunpoint. One of them hit Mike with a gun. Stan and Mike were crying. The defendant said that the two boys were going to "make the news." He told Ms. Clark that if people came looking for Stan and Mike she should tell them that the police had picked them up.

Later, Ms. Clark said, the defendant returned and gave her $50 to maintain the story about the police arresting Stan and Mike. He admitted that he had killed them and that the bodies were on the railroad tracks. The bodies were found the next day.

She gave a written statement to the police on September 16, 1993, and another on September 25, 1993. She did not mention the events of September 12 in her first statement. Twice she was given money to relocate. The first time she used the money to relocate but the second time she did not. At the time of this trial, several other individuals had been indicted in connection with the murder of Stan and Mike, but the defendant had not.

She says that in exchange for her testimony, prosecutors agreed to help her remain at the prison in which she then resided rather than another prison to which she was afraid she might be moved.

Prior to this trial and while Ms. Clark was in prison, she received six or seven visits from Charmaine Cathey, the defendant's girlfriend. Ms. Clark says that Ms. Cathey gave her $150 and said that the defendant would give her more money not to testify. Ms. Clark admits that she wrote several letters to Ms. Cathey demanding money from Ted in exchange for her silence. Ms. Cathey testified that she never showed these letters to the defendant.

Officer Michael Cronin testified for the State as a gang crimes expert. He testified that in 1993 there were two warring factions of the Unknown Vicelords in Chicago. Mr. Burks, Stan and Mike were aligned with Willie Lloyd and the defendant and Larry were aligned with Tyrone Williams. He also testified concerning how one could identify members of a gang through their tattoos and clothing.

Evidence was presented at trial that Eugene Cooney, one person who had viewed a lineup with the defendant, was dead at the time of trial. The record does not reveal whether the witness identified the defendant as the murderer. The record also contains no information concerning the circumstances of the witness' death.

The prosecution sought to have two photographs of Stan's and Mike's dead bodies sent to the jury room. The trial court allowed one photo but disallowed the other as unnecessarily gory.

The jury convicted the defendant of first degree murder, and the trial court sentenced him to 75 years' imprisonment. The defendant now appeals his conviction.

## ANALYSIS

### I

The defendant contends that the trial court abused its discretion in admitting evidence that he murdered Stan and Mike. The defendant argues, first, that such evidence was not relevant; second, that it was presented with unnecessary detail; and third, that any probative value was substantially outweighed by undue prejudice.

■ The prosecution may only introduce evidence of other crimes if

it is relevant to certain issues, such as *modus operandi*, identity, common plan or scheme, intent, motive or absence of mistake. *People v. McKibbins*, 96 Ill. 2d 176, 181, 449 N.E.2d 821, 823-24 (1983). The prosecution may not introduce such evidence to support the inference that the defendant committed the offense charged because he or she has a propensity to commit crimes. The danger is that the jury might convict the defendant simply because it feels he or she is a bad person. *People v. Lindgren*, 79 Ill. 2d 129, 137, 402 N.E.2d 238, 242 (1980). Moreover, the trial judge should consider whether the evidence is actually necessary in light of the availability to the prosecution of other methods of establishing the facts at issue. *People v. Nunley*, 271 Ill. App. 3d 427, 431-32, 648 N.E.2d 1015, 1018 (1995). In our view, the trial court failed to do this. While some of Ms. Clark's testimony undoubtedly had some relevance, the detailed testimony concerning the double murder and the use of the photo resulted in the probative value being outweighed by the prejudice resulting from the evidence. *People v. Stewart*, 105 Ill. 2d 22, 62, 473 N.E.2d 840, 860 (1984).

■ The trial court found that the other crimes evidence was relevant to establish a common plan or scheme. In our view, the evidence may have had some relevance for that purpose. Other crimes evidence may be admissible to show a common scheme of which the crime charged is only a part. *People v. Rose*, 198 Ill. App. 3d 1, 7, 555 N.E.2d 414, 418 (1990). In order for other crimes evidence to be admissible to show common plan or scheme, there must also be some degree of similarity between the crimes in question. *Rose*, 198 Ill. App. 3d at 7, 555 N.E.2d at 418. In this case, the evidence was relevant to show that the defendant had an overarching scheme to eliminate competition from the other faction of the Unknown Vicelords in selling drugs. The crime charged fit into this scheme, according to the prosecution's theory, because it was a response to Willie Lloyd's attempt to take over some drug territory.

The evidence was not admissible to show *modus operandi*. *Modus operandi* requires similarity between the crimes; the two crimes must share "distinctive common features so as to earmark both crimes as the handiwork of the defendant." *People v. Kimbrough*, 138 Ill. App. 3d 481, 486-87, 485 N.E.2d 1292, 1297 (1985); *McKibbins*, 96 Ill. 2d at 184, 449 N.E.2d at 825. For the common features to be distinctive, they must not be shared by most offenses of that type. *Kimbrough*, 138 Ill. App. 3d at 486-87, 485 N.E.2d at 1297. Here the two crimes did not have the requisite degree of similarity. One crime was a drive-by shooting at night at a crowded intersection. The other crime was a daytime kidnapping followed by a shooting in a deserted area.

Ms. Clark's testimony was relevant to the identity of the defen-

dant in that the defendant was driving a gray car before the murder of Stan and Mike, and also was allegedly in a gray car before Mr. Burks was killed. However, the testimony about the gray car could have been adduced without the extensive testimony and photographic evidence of the double murder.

Similarly, it was not necessary to bring up the double murder in order to prove motive. The motive for the killing, revenge, was established by Ms. Clark's testimony concerning the theft of drugs from Larry, the defendant's anger upon learning of that theft, and the removal of Stan and Mike from the street.

Finally, there was no issue as to intent or absence of mistake. Mr. Burks was shot a great many times at close range. The defense never disputed that he was intentionally killed.

Even if some evidence concerning the double murder were relevant, the judge erred in allowing extensive details concerning that crime into evidence. A trial court should carefully limit other crimes evidence to that which is relevant for the purposes for which it was introduced. *Nunley*, 271 Ill. App. 3d at 431, 648 N.E.2d at 1018.

In *People v. Nunley*, the defendant was convicted of a murder and armed robbery that had happened some time earlier. He had confessed to those crimes after he was arrested for, and also confessed to, attempting to decapitate his mother and killing her dog. The prosecution put on several witnesses about the later crime and introduced evidence of it to explain why he would confess to the earlier crime after a long period of time. *Nunley*, 271 Ill. App. 3d at 432, 648 N.E.2d at 1019.

The appellate court found this to be reversible error, even though the trial court had provided a limiting instruction. While the appellate court agreed that it would have been proper to admit some evidence of the later crime in order to explain the defendant's confession, it was not proper for the trial court to admit evidence concerning the details of that crime, for "[t]he testimony of one witness that, at the time of his confession, defendant was in custody for the aggravated battery of his mother would have sufficed to establish that his confession was motivated by remorse or an effort to clear his conscience." *Nunley*, 271 Ill. App. 3d at 432, 648 N.E.2d at 1019.

In this case, Ms. Clark testified to several details that could only serve to portray the defendant as callous and remorseless. For instance, Ms. Clark testified that Stan and Mike were crying as the defendant took them away. Under certain circumstances this might not have been greatly prejudicial, but here the prosecution made absolutely sure that it did not escape the jury's notice, arguing:

"Who were the people that Ted went with out in that desolate prai-

rie at 1 o'clock in the afternoon to murder those 2 kids because they were crying, who were the people he took into his fold, everyone that worked for him, right? All the people that work for Ted, he's the leader in that group, takes his little posse out there and assassinated the 2 kids as they lay crying and when they're done with that they leave."

The clearest example of unnecessary detail is perhaps the photo of Stan's and Mike's bodies that was sent to the jury room. Courts often find photos *of the victim of the crime charged* to be too inflammatory to properly be sent to the jury. *People v. Garlick*, 46 Ill. App. 3d 216, 224, 360 N.E.2d 1121, 1127 (1977). To send back a photo of the victims of *another* crime laid at the defendant's feet is extraordinary. The trial court's rationale for allowing the photo into the jury room was that the photo corroborated Ms. Clark's testimony concerning what the victims were wearing. However, the only time that Ms. Clark testified to the victims' clothing was on direct examination, *as she was looking at the photos*. None of the police officers or ASAs to whom Ms. Clark talked testified that she had known what the victims were wearing prior to seeing these photos. The photo only corroborated that Ms. Clark had correctly described the photo.

When denying the *in limine* motion to exclude other crimes evidence, the court said:

"I think that if the State attempts to go into the details of this double murder, exactly how these murders were carried out, and introduce photos of the victims and things of that nature, that is objectionable by me and the defense and I think it cannot be allowed."

Unfortunately, the trial court did not follow its own advice.

In the instant case, the evidence adduced regarding the double murder itself was irrelevant. Even though the court gave a limiting instruction, we hold that this was not sufficient to cure the unfair prejudice. *Nunley*, 271 Ill. App. 3d at 433, 648 N.E.2d at 1019.

One factor that the *Nunley* court found relevant to its decision was that the other crime concerning which evidence was introduced was "far more grotesque" than the crime for which the defendant was on trial at that time. *Nunley*, 271 Ill. App. 3d at 432, 648 N.E.2d at 1019. Significantly, in the case *sub judice*, the other crime in question, a kidnapping and double murder, was worse than the crime for which the defendant was convicted, a murder.

Additionally, in closing argument, the prosecution added to the prejudice from the other crimes testimony with such comments as the following:

"There are 3 people that will never testify. *** He made sure of that."

> "Willie Lloyd takes his guy, try to take your drug spot you go out and kill 2 of his guys, someone does something to you, you hit back, twice as hard. That's what the gangs are all about."
>
> "3 people are dead in a matter of 13 hours at his hand and at his partner's."

Such comments served to aggravate the prejudicial impact of the other crimes evidence.

Because the risk of unfair prejudice from other crimes evidence is considered quite high (*People v. McGee*, 286 Ill. App. 3d 786, 794, 676 N.E.2d 1341, 1347 (1997)), if a reviewing court determines that the trial court erroneously admitted such evidence, the error calls for reversal unless the record affirmatively establishes that no prejudice occurred. *People v. Lindgren*, 79 Ill. 2d 129, 140-41, 402 N.E.2d 238, 244 (1980); *People v. Atkinson*, 288 Ill. App. 3d 102, 106, 679 N.E.2d 1266, 1269-70 (1997). Here, prejudice occurred. Per force, we reverse.

## II

While we have determined that reversal is warranted based on the introduction of other crimes evidence, we will briefly examine the other issues raised by the defendant for guidance on trial at remand and also for completion. First, the defendant argues that it was reversible error for the trial court to allow "detailed" testimony about gang life from Officer Cronin. We disagree.

■ The defendant is correct that the admission of irrelevant and inflammatory gang testimony can be reversible error. *People v. Mason*, 274 Ill. App. 3d 715, 722, 653 N.E.2d 1371, 1376 (1995). Nevertheless, we have examined Officer Cronin's testimony and find it to be neither irrelevant nor unnecessarily inflammatory. The State's theory was that the murder was part of ongoing hostilities between two factions of the Unknown Vicelords. Officer Cronin testified that there was such a conflict in 1993 and how one could tell that the defendant and the victim were Unknown Vicelords, and he briefly explained the organization of the gang. *Mason*, the case cited by the defendant, does not mandate reversal, for the testimony in *Mason* was less relevant to the offense charged and much more extensive than the testimony in the instant case.

■ The defendant also claims that the trial court erred in allowing testimony that Anthony Townsend said that there had been attempts to intimidate him into not testifying against the defendant. However, testimony that witnesses were made to fear for their safety if they testified against a defendant may be admitted to explain inconsistent statements by the witnesses. *People v. Williams*, 262 Ill. App. 3d 734, 742, 635 N.E.2d 781, 787 (1994). In this case, the admission of such

evidence did not constitute an abuse of discretion, especially in light of the fact that the evidence was admitted only for impeachment purposes. The trial court orally instructed the jurors that they should only consider the alleged threats as a possible motive for Townsend to recant his grand jury testimony and not consider them against the defendant.

■ The defendant also contends that it was reversible error for the trial court to allow testimony that Eugene Cooney, a person who viewed a lineup with the defendant, was dead. The record does not disclose how he died. The defendant argues that this would lead the jury to think that he killed Mr. Cooney or had him killed.

In our view, even though the testimony that Mr. Cooney was unavailable could have been adequate to explain his absence without testimony that he was dead, we do not believe that it was error to admit the testimony. *People v. Pendleton*, 52 Ill. App. 3d 241, 250, 367 N.E.2d 196, 202 (1977). Testimony concerning Mr. Cooney was relevant to explain the course of the investigation, because police officers testified that they obtained the full license number of the defendant's car from Mr. Cooney. Proper testimony that Mr. Cooney was unavailable could be admitted to rebut the negative inference the jury might have drawn by Mr. Cooney's failure to testify. *Pendleton*, 52 Ill. App. 3d at 250, 367 N.E.2d at 202.

■ Finally, the defendant argues that he was denied a fair trial because the trial judge showed hostility and bias toward defense counsel and made *sua sponte* objections against defense counsel. A court has the power to ensure that proceedings before it are orderly. *People v. Griffin*, 194 Ill. App. 3d 286, 294, 550 N.E.2d 1244, 1249 (1990). It has the responsibility to achieve prompt and convenient dispatch of court business. *People v. Williams*, 201 Ill. App. 3d 207, 221, 558 N.E.2d 1258, 1267 (1990); *People v. Shum*, 117 Ill. 2d 317, 345, 512 N.E.2d 1183, 1193 (1987). Also, a court is permitted to make rulings without objections from counsel. *People v. Jackson*, 250 Ill. App. 3d 192, 204, 620 N.E.2d 1239 (1993).

Additionally, even were the trial judge's actions improper, in order for a trial judge's comments to merit reversal, there must be prejudice. *People v. Snulligan*, 204 Ill. App. 3d 110, 115, 561 N.E.2d 1125, 1128-29 (1990). The defendant must establish that the comments were a material factor in his or her conviction. *People v. Thomson*, 234 Ill. App. 3d 770, 773, 601 N.E.2d 765, 768 (1991). In our view, no prejudice resulted from the judge's role in the instant case.

For the preceding reasons, we reverse the defendant's conviction and remand for a new trial.

Reversed and remanded.

GORDON, P.J., and McNULTY, J., concur.