FIFTH DIVISION

MARCH 31, 2000

1-98-0047

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) 

)

HARRY ALEMAN, ) Honorable

) Michael P. Toomin,

Defendant-Appellant. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion of the court:

A jury found defendant Harry Aleman guilty of first-degree murder and he was subsequently sentenced to a term of 100 to 300 years' imprisonment.
(footnote: 1)  Defendant appeals from his second trial; among errors he identifies are:  (1) errors occurring during 
voir dire
 deprived him of a fair trial
; (2) the court erred in refusing to question individual jurors as to possible conversations with another juror; (3) the court erred in imposing certain security measures in the courtroom; (4) he was denied a fair trial by the admission of "other crimes" evidence regarding judicial bribery; (5) he was denied a fair trial by the State's alleged references to organized crime; (6) he was denied a fair trial in the admission of impeachment evidence indicating that he had committed a home invasion with an accomplice; (7) he was denied a fair trial where his attorney, in opening statement, referred to the testimony of a possible State witness who did not testify; (8) he was denied a fair trial where a witness testifie
d that the judge in defendant's previous murder trial committed suicide; (9) alleged prosecutorial misconduct at argument denied him a fair trial; (10) the court erred in refusing to grant his defense counsel a two-week continuance; (11) the court abused its discretion in limiting his cross-examination of State witnesses; (12) the court abused its discretion in curtailing the testimony of a defense expert; (13) the court erred in finding that the previous judge's suicide was admissible as rebuttal evidence if defendant chose to seek admission of the previous judge's specific findings; (14) he was denied due process as a result of alleged error occurring at his suppression hearing; and (15) issues relating to re-indictment and re-prosecution (double jeopardy, speedy trial) must be reconsidered in light of "new evidence."
  Issues (1), (2), (4), (5) and (9) will be considered in this opinion; issues (3), (6) through (8), and (10) through (15) will be determined in a separate Supreme Court Rule 23 order disseminated contemporaneously.

In the case 
sub judice
, the 23-volume record reflects that on retrial, the State presented evidence from several witnesses regarding Logan's murder.  Logan lived with his sister, Betty Romo, and another sister.  On September 27, 1972, Logan left for work at 11 p.m.  Shortly after, Romo heard three loud noises or shots.  Running outside, she discovered Logan, bleeding from two fatal shotgun wounds.  Logan had been divorced from defendant's second cousin, Phyllis Napoles.  They were engaged in a custody battle.  Previously, he had been arrested for her assault and battery.

Bobby Lowe, Logan's neighbor, testified that on September 27, while walking his dog, he observed a vehicle parked across the street with its engine running and Logan walking to his parked automobile.  As Lowe approached Logan to speak with him, the other vehicle pulled up.  Lowe heard two loud noises and saw Logan fly backwards.  Defendant exited the passenger side of the vehicle, approached Logan with a gun-like object in his hand, which he pointed at the fallen Logan.  Lowe stared at defendant for four or five seconds, standing three or four feet away, then turned and ran.  While running, he heard another loud noise and heard the vehicle drive away.  In 1972, he picked out defendant's photograph and again, in 1976, he identified defendant as Logan's shooter for police.  As a result of witnessing the shooting, Lowe was forced to quit his job and was relocated.  He received money from the State during both trials.  Lowe had incurred many debts, which he paid in part with money received from the State.

Louis Almeida, a career criminal who had grown up in the same neighborhood as defendant, testified for the State.  In March of 1975, while driving through Ohio on their way to "kill somebody" for $10,000 in Pennsylvania, he and Joe Neri were stopped by Ohio police and arrested for possession of weapons and a silencer.  Almeida provided police with information about his various criminal activities, including armed robberies, vehicle thefts, and bombings.  Later, he reported details of Logan's murder identifying himself as the driver and defendant as the shooter.  In exchange, Almeida was given immunity from prosecution for Logan's murder.

According to Almeida, in August of 1972, defendant discussed his plan to kill Logan and gave him two license plate numbers and Logan's home and work addresses, writing "Death to Billy" on the same piece of paper.  Almeida then trailed Logan to learn his habits and schedule.

   On the evening of September 27, 1972, defendant, armed with a shotgun and a .45 caliber handgun, was driven by Almeida to Logan's block, where he parked.  Almeida observed a man walking a dog.  At 11:15 p.m., he saw Logan.  Almeida drove the automobile near Logan.  Defendant called to Logan.  Logan walked toward  them.  Defendant shot him twice with a 12-gauge shotgun.  Logan "flew back" and began crawling and yelling for a doctor.  Defendant stepped half-way out of the car, but "shut the door on the car and [said], let's go, he's gone." 

The State then presented evidence regarding defendant's 1977 trial for Logan's murder, which resulted in acquittal.  Robert Cooley, a former Chicago Police Officer and attorney during the late 1970's, testified that while he was a police officer, and also later when he practiced criminal law, he often bribed judges, clerks and sheriffs.  While an attorney, Cooley visited the "Counselor's Row" restaurant, which members of Chicago's "First Ward" political organization frequented.

In February 1977, Cooley met with First Ward secretary Pat Marcy and ward committeeman John D'Arco, Sr.  Marcy told Cooley of defendant's "murder case" and asked him if he knew of a judge who could "handle it," or fix the case.  Cooley described Judge Wilson as a "very close" friend but a "drinker" who might need the money.
(footnote: 2)  Cooley approached Wilson, who initially informed Cooley that he had been "SOJ'd"
(footnote: 3) and was unable to help.  Cooley later told Wilson the case against defendant was weak, it could be handled very easily, and that Cooley would pay him $10,000 for an acquittal should the case be reassigned to Wilson.  Wilson later agreed to "handle" the case if Tom Maloney, then defendant's attorney, withdrew his SOJ motion and withdrew from the case; he also asked that Cooley not represent defendant, to avoid any appearance of impropriety.  Cooley then gave $2,500 to Wilson, the remaining $7,500 to be paid when the trial was over.

After paying Judge Wilson, Cooley met with defendant and another man, Marco D'Amico, assuring them both that the case had been fixed and that Wilson would acquit defendant.  Cooley told them of Wilson's conditions.  It was agreed that Frank Whalen, a former Chicago attorney living in Florida, would represent defendant, and Cooley met Whalen at the Bismark Hotel in April 1977.  There, Cooley told Whalen that Wilson was going to "throw the case out," but wanted no contact with Whalen.  Cooley would act as middleman; Whalen agreed.  

Cooley again met with defendant, who told him that Maloney had "come up with an alibi" for the night of Logan's murder, that defendant had been hitting golf balls with three or four friends.  Defendant also stated that "somebody" had "gotten to" police investigators and some of the police reports would not "make it" to court.  Cooley and defendant met again.  Butch Petrocelli was present.  Defendant informed Cooley that a female witness to the Logan murder had accepted $10,000 to testify that defendant had not done the shooting.  Cooley later informed Judge Wilson about this witness, who thought that was a good idea.  Cooley did not, however, inform Wilson of the $10,000 witness payment.  Cooley then met Whalen in Florida a week before the trial and again assured him that Wilson would throw the case out.

On the second day of the 1977 trial, Cooley met Judge Wilson, who was very upset because the case was not as weak as represented and Whalen was not doing a good job.  Cooley warned Wilson to follow through with the deal.  The next day, Cooley told Marcy of this development; Marcy responded that Wilson had better do as agreed.

Cooley again met with Judge Wilson.  Wilson had discovered that the female witness was receiving $10,000 for testifying falsely.  He complained of receiving $10,000 although he was a "full circuit judge," and requested more bribe money.  Cooley told Wilson he would see what he could do, but to fulfil his part of the deal or both would be in a great deal of trouble.  Cooley then met with Marcy again, addressing Wilson's demand; Marcy refused additional payment.

On May 24, 1977, Judge Wilson acquitted defendant of Logan's murder.  Marcy then gave Cooley two envelopes; one contained $7,500 for Wilson and the other held $3,000 for Cooley.  That evening, Cooley met Wilson at a restaurant.  In the men's room, Cooley gave Wilson the remaining $7,500 of the bribe.  Wilson said he was a "broken man" and that Cooley had "destroyed" and "killed" him.

A few weeks later, defendant, while with Petrocelli, thanked Cooley, telling him that he had done a great job, and asked Cooley for a few of his business cards so that he could send him more clients.

On cross-examination, Cooley testified, among other things, that since 1986 he had been paid $3,400 per month by the government.  He admitted having a heavy gambling habit and cheating on his taxes.  The State rested.

Defendant presented the testimony of several witnesses, including William Dietrich, Billy Logan's nephew, and Stanley Ryba, Logan's neighbor, to challenge Lowe's account of the shooting.  Dietrich, who was living with Logan on September 27, 1972, recalled being asleep on the front porch at 11 p.m.  He awoke to hear someone say, "hey, Bill, come here."  Immediately hearing two gunshots, he looked outside and saw Logan on his knees, falling backwards.  He noticed a large vehicle, but no one else on the street at that time.  Ryba, a neighbor of Logan's, testified that he was watching television in his home six houses away.  At 11 p.m., he heard a gunshot, looked out his window and saw a car double-parked on the street and a man "down" nearby.  No one else was in the area.  Guido Calcagno, Almeida's life-long friend, testified for defendant that he had known Almeida since they were both children.  Almeida was "not very truthful" with a "tendency to lie about everything."  Several police officers who had investigated Logan's murder testified that Lowe initially was "reticent" and fearful who, at first, only identified the occupants of the automobile as two white males.

Logan's son, William Jr., and Phyllis Napoles, defendant's second cousin and Logan's ex-wife, also testified for defendant.  They suggested that Petrocelli, not defendant, shot Logan.  Napoles described Logan as an abusive drunk and characterized her relationship with Logan as "tumultuous."  After her divorce from Logan in 1967, she had a relationship with Petrocelli, a "very violent" man with a "dark side."  In March 1972, Logan, in a drunken state, kicked the door of her home and threatened her.  Petrocelli, who was present, began arguing with Logan and a violent physical confrontation ensued, during which Petrocelli threatened to kill Logan.  Logan's son, William Jr., present during this fight, testified that he heard Petrocelli tell Logan that "he'll take him out."

The defense also presented the testimony of Ed Whalen, Jr., Frank Whalen's nephew, in questioning Cooley's account of Judge Wilson's bribe.  Whalen, Jr.  often helped his uncle with cases, including defendant's 1977 murder trial.  His uncle, who had partially retired to Florida, stayed in a condominium in the Hancock Building, not the Bismark Hotel, whenever he came to Chicago.  Whalen, Jr. never came into contact with Cooley during the 1977 trial.  The trial was legitimate and not fixed.  Neither Frank Whalen nor defendant ever indicated to Whalen, Jr. that the case had been predetermined.

The jury found defendant guilty and he was sentenced to a prison term of not less than 100 and not more than 300 years.

I

Defendant initially raises several issues concerning the selection of the jury, claiming he was denied a fair trial.

A

As a result of defendant's concern about pre-trial publicity, the circuit court employed a two-step process to select the jury, first, individually questioning  members of the venire (outside the presence of others) as to their knowledge about the case or defendant.  Those members who had been exposed to pre-

trial publicity were questioned further as to their knowledge of the facts and the effect, if any, of the exposure.  This "special," individual questioning by the court occurred outside the courtroom with only the attorneys and defendant present.  After excusing for cause those venire members who had knowledge of the case or defendant, the court then conducted the "typical" 
voir dire
: twelve venire members were called to the jury box and then questioned by the court and the attorneys, in the presence of the entire venire; those that were excused were then replaced by other members of the venire; and the process continued until 12 jurors were empaneled.  Defendant acquiesced in this two-step process, but now complains about the jury selection "atmosphere," contending it was "publicity-tainted." 

Of the approximately 70 venire members, only 16 indicated that they had heard about the case or defendant.  Of those, seven were excused for cause having expressed prejudice against defendant.  Also excused were four venire members who had heard about the case or defendant due to reasons not involving pre-trial publicity.

Defendant also portrays jury selection as rife with gossip and murmurs, pointing to an incident involving a venire member, Neva O'Laughlin, who was excused by the court because of her expressed inability to be impartial as a result of exposure to pre-trial publicity.  After excusing her for cause, the court was informed by a deputy that O'Laughlin, prior to jury selection, had been seen with five or six other venire members discussing defendant's case and his affiliation with the "mob."   As a cautionary measure, the deputy then pointed out to the court, as the venire members were questioned by the court, the individual venire members who had been seen near O'Laughlin.  Those venire members did not serve on defendant's jury.  Accordingly, defendant's assertion that the entire venire was somehow poisoned by pre-trial publicity is refuted by the record.

B

Defendant also claims that he was denied a fair trial because the circuit court refused him the right to question individually the venire members, during the first phase of jury selection, regarding pre-trial publicity, and failed to strike for cause four venire members.  He also insists that the court should have conducted "supplemental" 
voir dire
 of those four venire members.

The right to an impartial jury is fundamental to due process and any infringement of that right requires reversal.  
People v. Cole
, 54 Ill. 2d 401, 411, 298 N.E.2d 705 (1973).  One purpose of 
voir dire
 is to filter out and eliminate prospective jurors who are not impartial.  
People v. Peeples
, 155 Ill. 2d 422, 463, 616 N.E.2d 294 (1993); 
People v. Carroll
, 260 Ill. App. 3d 319, 342, 631 N.E.2d 1155 (1992).  Impartiality is not a technical concept, however, and a circuit court's determination of whether a prospective juror is biased is entitled to deference, given its superior position to gauge the meaning of responses to questions posed.  
People v. Pitsonbarger
, 142 Ill. 2d 353, 388, 568 N.E.2d 783 (1990).  Accordingly, unless against the manifest weight of the evidence, a court's determination, whether to strike a potential juror for cause, will be upheld.  
Peeples
, 155 Ill. 2d at 463.

Defendant points to four members of the venire whom the circuit court refused to strike for cause; however, none of those venire members sat on his jury.  In fact, three of them never were called and questioned during the second, "typical," phase of jury selection.  Only one was called to the jury box for the typical 
voir dire
 and questioned; after defense questioning, defendant used one of his peremptory challenges to excuse her.  Given the fact that none of the complained-of prospective jurors sat on defendant's jury, his assertion of prejudicial error is without foundation.  

The circuit court retains "broad discretion" in conducting 
voir dire
 and only where the court's procedures and decisions have frustrated the purpose of 
voir dire
 will an abuse of discretion be found.  
People v. Hope
, 168 Ill. 2d 1, 30, 658 N.E.2d 391 (1995); 
People v. Howard
, 147 Ill. 2d 103, 134, 588 N.E.2d 1044 (1991).  Here, the court went to extraordinary, if somewhat unorthodox,  lengths to ensure that an impartial and fair jury was empaneled.  The court's actions were undertaken for the sole purpose of guaranteeing an orderly and fair tribunal, which was accomplished.

C

Defendant also contends that the circuit court's refusal to ask the individual venire members about newspaper subscriptions denied him a fair trial.  A review of the record, however, indicates that the court's questions thoroughly addressed any potential prejudice due to exposure to pre-trial publicity.  Any questions regarding mere subscription information would have been cumulative and irrelevant.

The purpose of the special publicity 
voir dire
 was to ferret out those venire members who had actual knowledge of defendant or the case and to determine the effect, if any, of that knowledge on the individual.  Each venire member was asked if he or she had heard or read anything about defendant or his case before arriving at, or since entering, court.  When this first inquiry was answered affirmatively, the court then questioned the individual venire member as to the source and specific nature of the information and its effect.

Accordingly, defendant's suggestion that the circuit court abused its discretion in failing to ask generally about subscriptions does not persuade.  Such an inquiry would not have yielded any additional, cogent information regarding exposure to publicity.

D

Defendant also insists that he was denied a fair trial where the circuit court failed to give the venire a dinner break after a lengthy day of jury selection to the expressed dissatisfaction of the venire, which, he claims,  alienated and enraged the jury. 

The circuit court conducted 
voir dire
 over an admittedly lengthy period.  From the early afternoon until nearly 9 p.m., the court and attorneys questioned the venire.  The court's decision was expressly made to accommodate the "one day/one jury" promise initially made to the venire members:  "my fear is that if we don't move forward with the regular 
voir dire
 we are going to get a lot of angry people and we will lose much of what we accomplished today."  To deflect any animosity toward the attorneys, the court also advised the empaneled jurors that it was the court's decision, not the attorneys', to work late for which the court took responsibility.  Moreover, given that the procedures instituted by the circuit court were undertaken in response to defense fears regarding pre-trial publicity, it cannot be said the court abused its discretion.  
Hope
, 168 Ill. 2d at 30.

E

Defendant next argues that he was denied a fair trial because the circuit court "bridled" defense questions to the jury and "constantly" sustained the State's objections to defense questions.  The State did object to defense questioning of venire members; however, those questions were over-broad and nonspecific.  The State's objections were appropriate.

Prior to 
voir dire
, the circuit court warned the defense several times that questions dealing with the evidence in the case or involving the venire members' "feelings" about issues in the case were inappropriate.  Nevertheless, the defense, on numerous occasions, queried the venire members as to their "feelings" about various principles of law and attempted to suggest to the jury its theory of the case.  The court did not forestall proper inquiry, but merely prevented the defense from asking either legitimate questions in an inappropriate manner or improper questions.  See 166 Ill. 2d R. 431.  Accordingly, the court did not abuse its discretion in sustaining objections to clearly inappropriately-worded defense questions.  See 
People v. Zehr
, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984); 
People v. Williams
, 159 Ill. App. 3d 527, 532, 512 N.E.2d 35 (1987).

F

Defendant also claims that the circuit court "failed to allow attorney-

questioning of prospective alternate jurors" in violation of Rule 431(a) (166 Ill. 2d R. 431(a)).  Defendant's argument, however, is waived due to his failure to object at trial. 

Before selection of the alternates, the circuit court indicated that the court, not the attorneys, would ask the questions.  Defendant did not object to this procedure.  In any event, defendant has failed to show how the court abused its discretion in appropriately questioning alternate jurors.  See 
People v. Terrell
, 185 Ill. 2d 467, 484, 708 N.E.2d 309 (1998).

G

Defendant's final issue in this regard is that the circuit court erred in refusing to require the State to explain its use of peremptory challenges directed at two African-Americans and one Hispanic venire member.  

In raising a 
Batson
 claim, a defendant must first prove that the prosecutor exercised peremptory challenges to remove venire persons of a cognizable racial group and that the relevant circumstances create an inference of discrimination in the exclusion based on race.  
People v. Evans
, 125 Ill. 2d 50, 61-67, 530 N.E.2d 1360 (1988); see also 
People v. Evans
, 186 Ill. 2d 83, 91, 708 N.E.2d 1158 (1999).  Relevant circumstances may include: a pattern of strikes; the prosecutor's questions during 
voir dire
; a disproportionate use of peremptory challenges; whether the excluded members were a heterogeneous group sharing race as the only common characteristic; the level of representation in the venire as compared to the jury; and the race of the defendant, victim and witnesses.  
People v. Edwards
, 144 Ill. 2d 108, 153, 579 N.E.2d 336 (1991).  Only if a court finds that a defendant has met a 
prima facie
 showing will the court require the State to provide race-neutral reasons for the exercise of its peremptory challenges.  
Batson v. Kentucky
, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986); 
People v. Fort
, 248 Ill. App. 3d 301, 307-08, 618 N.E.2d 445 (1993).  

Here, immediately after the State exercised its first three peremptory challenges, defendant raised his 
Batson
 claim, arguing that two of the State's challenges were directed at a "black female" and a "Hispanic male."  When asked by the circuit court how these two challenges evidenced a pattern of strikes, defense counsel responded, "I don't think there needs to be a pattern of strikes."  Defense counsel's misconception replayed itself when, after the State exercised two more peremptory challenges, defense counsel was unable to show a pattern, but only pointed to the State's striking of two black males.

The circuit court correctly found that defendant did not meet his burden of proving a 
prima facie
 case of purposeful discrimination.  Beyond the absence of any pattern of strikes, the record reflects no indication of racist motives in the prosecutor's questions and no indication of a disproportionate use of challenges against a specific racial group.  See  
People v. Harris
, 164 Ill. 2d 322, 344, 647 N.E.2d 893 (1994); 
People v. McDonald
, 249 Ill. App. 3d 702, 619 N.E.2d 229 (1993).  The record is silent as to the composition of the venire or the jury and the race of the witnesses.  Accordingly, his 
Batson
 claim is unsubstantiated.  

Defendant concludes that the cumulative effect of the alleged errors occurring during jury selection deprived him of his constitutional rights.  None of his claims have individual merit and, therefore, cannot combine to establish prejudicial error.  See 
People v. Albanese
, 102 Ill. 2d 54, 82-83, 464 N.E.2d 206 (1984).

II

Defendant next claims that the circuit court erred in refusing to question individual jurors as to possible conversations with another juror. 

On the second day of trial, after several witnesses had testified, the circuit court was informed that a juror had communicated with an assistant state's attorney (ASA) who was not involved in the case.  Outside the presence of the jury, the court then questioned the juror, Brenda Smith, who explained that she had telephoned the ASA because she "was just worried about this case and where it's going and what could happen to [her] as well as *** family members [and] just wanted to know if there was anything [she] could do to take [herself] out of it."  The court determined that the ASA had refused to speak with Juror Smith and had told her "to make the best of it"; nevertheless, the court inquired further as to whether Juror Smith had "discussed [her concerns] with anybody else."  Although Smith initially answered "no," when asked whether she had "discussed any of this with your fellow jurors," Smith later answered, "Yeah.  I mean, I guess -- yeah.  There have been times when we have said things or whatever when we walk in and we look at each other and kind of, you know, wow, 

that was, you know--."

The circuit court then interrupted Juror Smith, stating "That's not a discussion" to which Smith agreed:  "No I guess not then."  A lengthy colloquy then took place between the court and Smith, in which the court specifically questioned Smith regarding whether she had expressed her fears and concerns to the other jurors.  In her answers, Smith vacillated, claiming that she and the other jurors "lightheartedly" spoke about being around after the trial to exchange Christmas cards.  Smith nevertheless acknowledged that she did "not really [have] conversations" about her fears, she only discussed her trouble "sleeping at night."  The circuit court then asked Juror Smith if her feelings would prevent her from deciding the case based upon the evidence and the law; her response was equivocal.  Defendant asked the court to remove Juror Smith and also moved for a mistrial, contending that the entire jury had been "poisoned."  Defendant also suggested that the court question the other jurors as to possible conversations with Juror Smith.  The court refused, finding that Juror Smith had not expressed or verbalized her concerns to the other jurors.  The court did, however, excuse Juror Smith from defendant's jury.

As a rule, it is improper for jurors to discuss among themselves the case or any subject connected to the case until all the evidence has been presented and after receiving final instructions.  
People v. Cloutier
, 178 Ill. 2d 141, 160-61, 687 N.E.2d 930 (1997).  Nevertheless, "under certain circumstances discussions of evidence among jurors before the final submission of a criminal case have been deemed not to have been improper, or as not having resulted in prejudicial error where, for instance, a review of the jurors' responses to questions of the trial court indicated that the jurors' impartiality had not been affected by their discussions among themselves of certain exhibits prior to deliberations."  
Cloutier
, 178 Ill. 2d at 161, quoting 75B Am. Jur. 
Trial
 § 1610, at 379-80 (1992).

The circuit court deemed an inquiry among other jurors as to Juror Smith's conduct a potential "Pandora's box," because of its finding that Juror Smith had not expressly admitted to communicating to the other jurors about her fears or the case.  See, 
e.g.
, 
Cloutier
, 178 Ill. 2d at 161.  The court's declination to question the other jurors as to whether Juror Smith had expressed her fears or concerns was not 
reversible
 error.  The court was in the best position to judge Juror Smith's responses.  Given that Juror Smith never indicated that she actually had discussion with the other jurors about the case, its facts, or her own fears, the court did not abuse its discretion.

IV

Defendant urges that he was denied a fair trial by the admission of "other crimes" evidence concerning the Judge Wilson bribe.  He claims that the State presented a "mini-trial" on the issues of the bribery, therefore depriving him of a fair trial. 

Although inadmissible to show a propensity to commit crimes, other crimes evidence may be admissible to show consciousness of guilt. 
People v. Bean
, 137 Ill. 2d 65, 107-08, 560 N.E.2d 258 (1990)
.  Whether to admit or exclude other crimes evidence rests within the discretion of the circuit court and that decision will not be reversed absent abuse.  
People v. Kliner
, 185 Ill. 2d 81, 146, 705 N.E.2d 850 (1998); 
People v. Illgen
, 145 Ill. 2d 353, 364, 583 N.E.2d 515 (1991).  Here, the evidence of the bribe, although prejudicial, was clearly probative and relevant to show defendant's consciousness of guilt.  

Defendant claims that Cooley's testimony had attenuated probative value "since the bribe was orchestrated not by [defendant], but by third parties."  The record reveals, however, that on several occasions, Cooley met with defendant and the two discussed the bribery of Judge Wilson.  Defendant's attempt to distance himself from the actual bribery falls short and is not supported by the record.

Defendant also claims that the evidence of the bribery constituted an unacceptable "mini-trial," which caused him manifest prejudice.  He asserts that Cooley's testimony, rather than simply recounting the bribery, provided the jury with a story of police and judicial corruption, clandestine meetings during which payoffs took place, threats by "dangerous" people, a conspiracy in the "First Ward," and the imprisonment of a number of "First Ward" associates.  The State counters that the extensive evidence of the bribery conspiracy was presented, in part, in response to defendant's theory of the case that the bribery never took place but, if it had, he did not participate.

The admission of other crimes evidence, although relevant, should not lead to a "mini-trial" of a collateral offense.  
People v. Nunley
, 271 Ill. App. 3d 427, 432, 648 N.E.2d 1015 (1995).  The circuit court therefore must carefully limit the details to what is necessary to illuminate the issue for which the other crime was introduced.  
People v. Bartall
, 98 Ill. 2d 294, 315, 456 N.E.2d 59 (1983); 
People v. Chambers
, 259 Ill. App. 3d 631, 634-35, 631 N.E.2d 817 (1994).  Erroneously admitted evidence of other crimes requires reversal unless the record affirmatively establishes acceptable justification.  
People v. Thigpen
, 306 Ill. App. 3d 29, 39, 713 N.E.2d 633 (1999).

In the present case, the circuit court carefully limited the evidence of the bribery, excluding all references to organized crime or defendant's connections to the "Mafia."  Further, the court explicitly instructed the jury, during Cooley's testimony and again at the close of the case, that the purpose of admitting the bribery evidence related only to defendant's consciousness of guilt and the relationships with other witnesses.  Although Cooley's testimony relating the facts of the bribery was extensive, and the State focused on that evidence, it cannot be said that the court abused it discretion in allowing the bribery testimony.  That testimony of necessity explicated the delay in bringing defendant to trial almost 25 years after the offense; explained defendant's initial acquittal; and ineluctably revealed defendant's consciousness of guilt.  Evidence concerning the conspiracy and the individuals involved in that conspiracy was essential to explain defendant's role as a participant in the bribery of Judge Wilson.  For these reasons, defendant's argument is defeated.

V

Defendant further claims that he was denied a fair trial by the State's allegedly veiled references to organized crime. 

Resolving questions concerning the admissibility of evidence rests within the sound discretion of the circuit court and its decision will not be disturbed "absent a clear abuse of discretion resulting in manifest prejudice."  
People v. Lucas
, 151 Ill. 2d 461, 489, 603 N.E.2d 460 (1992).  The decision to deny a mistrial also is within the discretion of the court and will not be reversed unless a clear abuse of that discretion is manifest.  
People v. Hall
, 114 Ill. 2d 376, 405, 499 N.E.2d 1335 (1986).  A mistrial should be granted only where the jury has been so influenced and prejudiced that it would not be fair and impartial and that the damaging effect of the evidence cannot be remedied by admonitions or instructions.  
People v. Camden
, 219 Ill. App. 3d 124, 136, 578 N.E.2d 1211 (1991).

In the case 
sub judice
, the circuit court excluded all references to organized crime.  The court allowed references to the "First Ward" political organization, however.  In compliance with this limitation, no specific "mafia" or "mob" references were made.  Nevertheless, defendant insists that the State's conduct in adducing evidence, both from its own witnesses and in cross-examination of defense witnesses, injected thinly-veiled references to organized crime into the trial.  Defendant also points to the State's cross-examination of defense witness Ed Whalen, Jr. in which the State asked him if he knew whether his uncle also had represented a "brother named Spilotro" and Joey Aiuppa, "a big guy in the First Ward."  The State also asked Phyllis Napoles, Logan's ex-wife and defendant's cousin, if defendant's uncle was Joe Ferriola and whether Ferriola was a First Ward member. 

The record clearly shows that evidence concerning the "First Ward" and its members and associates played a large part in defendant's trial.  Nevertheless, defendant's contention, that only a "group of dimwits" would miss the organized crime references, must fail.  Simply because certain individuals involved in the bribery conspiracy were also associated with organized crime is no reason to redact those persons from the facts of this case.  

Ironically, in his assertions of error, defendant essentially attempts to rewrite history, decrying references to anyone remotely associated with organized crime; yet he used those individuals, for example, blaming Petrocelli for Logan's murder, to fit his defense.  Much of the evidence of which defendant complains was elicited through defense questioning: Cooley's gambling debts and threats received from First Ward associates were elicited on cross-examination.

Here, naming the "players" in the conspiracy and criminal plot did not constitute reversible error.  Defendant's argument misses the mark.

IX

Defendant next contends that he was denied a fair trial by multiple instances of improper prosecutorial argument, including inflammatory comments about defendant, attacks on defense counsels' integrity and reference to defendant's failure to testify.

A prosecutor is given considerable leeway in making closing and rebuttal argument and is allowed to argue the evidence and reasonable inferences drawn from that evidence.  
People v. Gutirrez
, 205 Ill. App. 3d 231, 261, 564 N.E.2d 850 (1990).  It is entirely proper for the prosecution to denounce a defendant's behavior, engage in some degree of invective and draw inferences unfavorable to the defendant if such inferences are based upon the evidence.  
People v. Bunting
, 104 Ill. App. 3d 291, 296, 432 N.E.2d 950 (1982).  In determining whether a prosecutor's closing comments are prejudicial, reference must be made to the entire argument, to the context of the language used, its relation to the evidence and the effect of the argument on the rights of the defendant to a fair and impartial trial.  
People v. Kitchen
, 159 Ill. 2d 1, 38-39, 636 N.E.2d 433 (1994).  The character and scope of closing argument is left largely to the circuit court and every reasonable presumption must be indulged that the court properly exercised its discretion.  
People v. Morgan
, 112 Ill. 2d 111, 113, 492 N.E.2d 1303 (1986).  Defendant shoulders a heavy burden of persuasion in seeking to reverse a conviction on the ground of improper argument; only if the challenged remarks constituted a material factor in the conviction, without which the jury might have reached a different verdict, is reversal merited.  
People v. Lann
, 194 Ill. App. 3d 623, 628, 551 N.E.2d 276 (1990).  The dispositive question in the case at bar, therefore, is whether the prosecutor's argument resulted in substantial prejudice to defendant, and constituted a material factor in his convictions without which the jury's verdict might have been different. 

Here, the prosecutor's negative references to defendant were palpable; he said, "You may think you see his personality, and the way he acts over here for the show.  But you know, his personality it that of a hitman."  This reference to defendant as a "hitman" was an improper attempt to draw a connection between defendant and an organized crime syndicate, in circumvention of the circuit court's order barring such references.  The prosecutor also exceeded the bounds of proper argument by his negative portrayal of defense counsel: "But what [defendant's] attorneys have done is not unlike want was done in 1977 when it went to trial.  Different form, different style.  But they don't want you to follow the law."  Nothing in the evidence presented at trial or in defense argument precipitated such an argument.  

Of greatest concern, however, are the prosecutor's comments
 that "[Defendant]'s the only one in this room who didn't come on this witness stand and talk about accepting responsibility.  And again, the defendant does not have to testify. *** But those other witnesses told you about their accepting of their responsibility."  In addition, the prosecutor theorized about the possibility of a third shot, but stated that only defendant "knows."  Taken as a whole, those comments reflect a calculated attempt to draw attention to defendant's invocation of his right of refusal to testify.  This line of argument had the greatest potential for prejudicing the defense and for denying defendant a fair trial.  See 
People v. Hawkins
, 284 Ill. App. 3d 1011, 675 N.E.2d 642 (1996); 
People v. Tipton
, 222 Ill. App. 3d 657, 661-62, 584 N.E.2d 310 (1991).

The State attempts to minimize the nature of the argument and its effect, asserting that, because the circuit court sustained a defense objection to the State's comment on defendant's failure to testify, any error was cured.  Argument made by the prosecutor, attempting to emphasize defendant's failure to testify at trial, however, clearly constituted prosecutorial misconduct.  Nevertheless, those comments, to which objections were sustained by the circuit court, must be juxtaposed with the numerous instances in which both the court and the attorneys advised and instructed the jury that defendant was not required to testify.  See 
People v. Lawler
, 142 Ill. 2d 548, 564, 568 N.E.2d 895 (1991) (jury instructions had curative effect on improper argument because arguments of counsel do not have the same impact on the jury as do the jury instructions); 
People v. Harris
, 132 Ill. 2d 366, 386, 547 N.E.2d 1241 (1989).

On numerous occasions during jury selection, both the circuit court and attorneys emphasized defendant's right to refuse to testify.  During the second phase, or general, 
voir dire
, the court instructed the entire venire that defendant, innocent until the State proves him guilty beyond a reasonable doubt, need not testify.  Likewise, the court and defense counsel, on a number of occasions addressed defendant's right not to testify.  After the jury was selected and sworn, but before evidence was presented, the court again advised the jurors of defendant's right not to testify.  Following presentation of the evidence, in the State's closing argument, the prosecutor also emphasized defendant's right not to testify: "And again *** [defendant] doesn't have to put up a defense."  Finally, the court instructed the jury as to defendant's presumption of innocence and his right not to testify:  "The defendant is presumed to be innocent of the charge against him, and this presumption remains with him throughout every stage of the trial and during your deliberations on the verdict, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that he is guilty.  The [S]tate has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the [S]tate throughout the case.  The defendant is not required to prove his innocence."  The court also instructed the jury: "The fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict." 
 Notwithstanding the curative effect of these remarks and instructions to the jury, defendant insists he was denied a fair trial, relying upon 
People v. Blue
, No. 84046 (January 27, 2000).
(footnote: 4)
Unlike 
Blue
, the errors attributable to the prosecutor's closing argument in the case 
sub judice
 did not attain the level demonstrated in 
Blue
 nor did those errors prejudice defendant's right to a fair trial.  A review of the record reveals that, despite the conduct by the prosecutor, the evidence presented at trial overwhelmingly implicated defendant in Logan's murder.  The circuit court promptly sustained objections to the improper argument and curatively instructed the jury.  Accordingly, given the manifest weight of evidence demonstrating  defendant's guilt, and the court's corrective measures, the prosecutor's comments cannot be said to have altered the outcome of trial.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

THEIS, P.J., and GREIMAN, J., concur.

FOOTNOTES
1:
On September 27, 1972, Billy Logan was shot to death on West Walton Street in Chicago.  In December 1976, defendant was indicted for Logan's murder.  Following a bench trial before Judge Frank Wilson in May of 1977, defendant was acquitted.  Several years thereafter,  federal investigators uncovered evidence that Judge Wilson had accepted a $10,000 bribe to find defendant not guilty.  In February 1990, two months after Judge Wilson was informed by the FBI of the investigation into bribery, he committed suicide.  In December 1993, defendant was again indicted for Logan's murder.  Although he sought to dismiss the indictment through the application of double jeopardy principles, the circuit court held that double jeopardy did not bar re-indictment or re-prosecution.  This court affirmed (see 
People v. Aleman
, 281 Ill. App. 3d 991, 667 N.E.2d 615 (1996)); accordingly, defendant was retried, from which result the present appeal is taken.

2:
Cooley also testified that Judge Wilson was "very straight" and a "state-

minded" judge, who, to his knowledge, had never accepted a bribe.

3:
Referring to a motion for substitution of judge.

4:
In 
Blue
, the supreme court held that errors committed at the defendant's trial "cast doubt upon the reliability of the judicial process" and "created a pervasive pattern of unfair prejudice."  
Blue
, No. 84046, slip op. at 33.  Accordingly, the 
Blue
 court reversed the defendant's conviction for shooting and killing a police officer.  Errors occurring at trial included the improper introduction and display of the dead officer's bloodied uniform, the inflammatory testimony of the victim's father highlighting the poignancy of the family's loss, the inflammatory testimony from a police commander regarding the oath which the victim took, "testifying" by the prosecutors, and improper argument by the prosecutors that the victim's family needed to "hear" from the jury and that the jury should also send a "message" of its support to the police.  Finding that the cumulative effect of these errors denied the defendant a fair trial, the court further emphasized the State's "overbearing conduct in pursuit of defendant's convictions" and its unprofessional and improper behavior at trial.  
Blue
, No. 84046, slip op. at 34-35.