NOTICE
Decision filed 12/11/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 160541-U

NO. 5-16-0541

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Randolph County. |
| | ) | |
| v. | ) | No. 15-CF-26 |
| | ) | |
| DREW PETERSON, | ) | Honorable |
| | ) | Richard A. Brown, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where only unilateral intent is required for a solicitation of murder for hire charge, the State did not fail to prove an element of the charge beyond a reasonable doubt. Where the evidence did not support any improprieties warranting suppression of eavesdropping recordings, the trial court did not err in denying the defendant's motion to suppress. Although the trial court did not fully comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. July 1, 2012)) in questioning prospective jurors, the defendant forfeited review of this issue and also cannot establish that the evidence was closely balanced to warrant plain error review. Introduction of other-crimes evidence to establish the defendant's motive and intent was not more prejudicial than probative. Where the errors alleged by the defendant were either not preserved for appeal or not subject to plain error review, he was not deprived of a fair trial, and the conviction and sentence are affirmed.

¶ 2    The defendant, Drew Peterson, appeals his conviction for solicitation of murder for hire. The evidentiary foundation for the offense came from eavesdropping recordings of conversations between the defendant and a fellow inmate incarcerated at Menard prison. During these recorded

1

conversations, the defendant asked his fellow inmate for assistance in having the Will County State's Attorney murdered.

¶ 3    The defendant raises several issues on appeal. He contends that the State failed to prove an element of solicitation of murder for hire beyond a reasonable doubt; that the trial court committed reversible error by denying his motion to suppress the eavesdropping recordings; that the trial court committed plain error by failing to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) in addressing prospective jurors; that the trial court committed reversible error by admitting overly prejudicial evidence that the defendant allegedly abducted and murdered his fourth wife; and that he is entitled to a new trial because the cumulative errors in this case denied him of his right to a fair trial. For the following reasons, we affirm.

¶ 4                              I. BACKGROUND

¶ 5    The defendant was charged by information with two counts on February 9, 2015. Count I charged the defendant with solicitation of murder for hire, while count II charged him with solicitation of murder. Both charges related to conduct that allegedly occurred between September 2013 and December 2014. In count I, the State alleged that the defendant, intending that first degree murder be committed, procured "Individual A" to commit murder for United States currency. In count II, the State alleged that the defendant requested "Individual A" to commit murder by finding a third person to kill James Glasgow. Glasgow is the Will County State's Attorney.

¶ 6    In April 2015, prior to trial, the State filed a motion asking the court to allow the admission of the following evidence of the defendant's motive and intent to kill Glasgow: (1) evidence that the defendant's fourth wife, Stacy Peterson, had disappeared and he was a suspect in her disappearance; (2) evidence that days after Stacy's disappearance, Glasgow's office charged the

2

defendant with illegally transferring a gun to his son, Stephen; (3) evidence that Glasgow successfully prosecuted the defendant for the murder of his third wife, Kathleen Savio; (4) evidence that in the defendant's trial for Savio's murder, the court allowed the admission of hearsay statements from Savio and Stacy after finding by a preponderance of the evidence that the defendant had murdered both women to make them unavailable as witnesses; (5) the defendant's statement in allocution in Savio's case; and (6) the defendant's statements to "Individual A" that Glasgow was interfering with his appeal in the Savio case, that Glasgow would charge him for Stacy's disappearance, and that Glasgow got his son Stephen fired from his job.

¶ 7    In August 2015, the defendant moved to suppress the eavesdropping recordings, alleging that Glasgow and his chief deputy, Ken Grey, improperly authorized applications seeking judicial approval to use an eavesdropping device. He argued that because Glasgow was the alleged victim, he had a conflict of interest, and therefore his involvement in the application was improper. The defendant also alleged that Will County Judge Richard Schoenstedt, who granted the applications, personally interviewed "Individual A" at Stateville prison 20 days before receiving the first application. He argued that Judge Schoenstedt's orders authorizing the eavesdropping recordings were improper because he had become part of the investigation and was therefore not impartial.

¶ 8    The trial court denied the motion to suppress on October 23, 2015, but took the State's motion for admission of evidence under advisement. Just before trial commenced, the trial court entered its order allowing the State's requested evidence.

¶ 9    At trial, the State's opening statement contained many references to what the jurors would hear in the eavesdropping recordings, including derogatory statements made by the defendant where he referred to the Will County prosecutors as "idiots" and to the State as "bitches." The State also referenced the defendant's claims that Glasgow was influencing his appeal of the Savio

3

murder. The prosecutor characterized the defendant as being happy about the plot to have Glasgow murdered.

¶ 10    Will County State's Attorney James Glasgow testified. He stated that on March 1, 2004, the defendant's third wife, Kathleen Savio, was found dead in a bathtub. At the time of her death, Savio and the defendant were divorced, but were still litigating the disposition of the marital property. Glasgow testified that during an initial investigation into Savio's death, the defendant's fourth wife, Stacy Peterson, provided the defendant with an alibi. On October 28, 2007, Stacy disappeared. Glasgow testified that she had been contemplating divorce at the time. After Stacy's disappearance, Glasgow reopened an investigation into Savio's death. Savio's death was subsequently found to have been the result of a homicide and not an accidental drowning.

¶ 11    Glasgow testified that in 2008, his office charged the defendant with transferring an unlawful weapon to his son, Stephen, who was a police officer. Thereafter, Stephen Peterson was fired from his job, in part because of the transfer of the gun ownership.

¶ 12    Glasgow further testified that in late 2008, his office charged the defendant with the murder of Savio. During that case, the Will County State's Attorney's Office presented evidence to the trial court in support of the State's request to admit into evidence the statements of both Savio and Stacy. At the conclusion of that hearing, the trial court found by a preponderance of the evidence that the defendant had murdered both Savio and Stacy and therefore admitted their statements. The defendant was ultimately convicted of murdering Savio.

¶ 13    Glasgow testified that in early August 2014, he received a letter from an inmate named Antonio Smith. Glasgow directed his chief deputy, Ken Grey, and an assistant state's attorney to interview Smith. Grey called the Federal Bureau of Investigations (FBI), which then began running the investigation with the cooperation of the Illinois Department of Corrections (IDOC). Glasgow

4

explained that he asked the FBI for assistance because their ability to investigate prison conduct and to conceal recording devices was "at a completely different level."

¶ 14　Glasgow testified briefly about the defendant's threat to kill him and how that threat upset his family. He explained that he knew that the threat was legitimate because the defendant had committed murder before.

¶ 15　On cross-examination, Glasgow testified that the Savio murder conviction was pending on appeal when he received the letter from Smith and when he signed the eavesdropping authorization. He confirmed that the defendant did not use the words "kill" or "murder" in any of the recordings but testified that, in his opinion, the implication was there.

¶ 16　FBI Agent Ron Bratcher testified that the recording devices utilized pursuant to the eavesdropping authorizations were programmed to record Monday through Friday, from 1:45 p.m. to 2:45 p.m. ("chow" time) and on weekends from 7:30 a.m. to 11 a.m. ("yard" time).

¶ 17　Antonio Smith testified that he was "Individual A." Smith acknowledged that he was a gang member who had prior convictions for attempted murder, home invasion, forgery, and burglary. He was placed at Menard prison in 2011. In August 2013, he was placed in protective custody where he met the defendant. He and the defendant became friends.

¶ 18　Smith testified about his conversations with the defendant, and the recordings of some of those conversations were admitted into evidence. According to Smith, the defendant was upset about his conviction in the Savio case because he claimed he was innocent. The defendant blamed Glasgow for his situation, telling Smith that Glasgow had lied and that he was "under the table with the judges" and with the appellate court. The defendant told Smith that Glasgow wanted to have his police pension revoked and that he had gotten the defendant's son fired from his job. During these conversations, the defendant talked with Smith about a clergyman who had spoken

5

to Stacy and who testified at the Savio murder trial. Smith testified that the defendant told him "that the clergyman didn't know, but he was talking to a dead woman," which Smith interpreted as the defendant's admission that he had killed Stacy. Smith testified that the defendant later admitted to murdering Stacy, stating that he believed Stacy knew that he had murdered Savio.

¶ 19   As the friendship between the defendant and Smith developed, in the fall of 2013, the defendant told Smith that he needed him to find someone to kill Glasgow. Smith testified that he believed the defendant was serious about this request. In exchange, the defendant promised that he would "take care" of Smith and his family. He offered $10,000 to whomever committed the murder. Not knowing what to do, Smith falsely told the defendant in October 2013 that he had found someone to commit the crime. In November 2013, Smith again told the defendant a false story to buy time during which he could figure out what he should do with this information.

¶ 20   Smith testified that he eventually decided to turn to an officer in Menard internal affairs—someone he had worked with before. He left a message for this officer, but the officer did not contact Smith.

¶ 21   In February 2014, Smith was transferred to Pontiac prison. Smith and his new roommate, Adrian Gabriel, decided to use the information about the defendant and his plans for their benefit. Smith wanted a reduction in his sentence. He wrote letters to various authorities and eventually met with officials from the Will County State's Attorney's Office for an interview. Smith asked that he and Gabriel be transferred to Stateville. That request was granted. Smith did not request any other favors for his cooperation, but he asked that he be kept safe. Later, a Will County judge came to the prison and interviewed him. He agreed to wear a recording device.

¶ 22   On October 22, 2014, Smith was transferred back to Menard. He testified that the first opportunity he had to speak with the defendant, Smith asked the defendant if he still wanted

6

Glasgow to be killed. The defendant said that he did. In mid-November 2014, Smith began wearing the recording device. Smith had previously told the defendant that his uncle would commit the murder. On the recording, Smith told the defendant that his uncle was "ready." The defendant told Smith that he still needed Glasgow gone because it would get him out of prison.

¶ 23   In a written note, Smith asked the defendant if he was ready to "green light" the project. The defendant responded and said that he was. Smith testified that he believed this meant that the defendant was ready to have Glasgow killed.

¶ 24   In another recording, Smith and the defendant continued to talk about the planned murder and other future projects the two had planned. One of the future projects involved a Mexican cartel and illegal drug distribution via an airplane to be piloted by the defendant. The defendant told Smith that if Glasgow remained alive, he would charge him with Stacy's disappearance. When Smith attempted to clarify that Stacy was dead, the defendant said: "No. Stacy's still alive, runnin' around out there."

¶ 25   The conversations between Smith and the defendant continued until late November 2014. Smith testified that by November 29, 2014, the defendant seemed suspicious and told him that someone "stinks of informant." Smith denied that he was an informant, but he called his prison contact to tell him that the defendant was suspicious. By December 3, 2014, Smith was transferred out of Menard prison for his safety. In February 2015, he was transferred to a federal prison.

¶ 26   The recordings of the defendant's conversations with Smith reveal that the defendant never explicitly used words like "kill" or "murder." The following is an example of one such exchange:

> "SMITH: I told him what you said—that it's the green light on, that —basically go ahead and kill him.
> PETERSON: Right.
> SMITH: That's what you wanted right? It ain't no—it ain't no turnin' back.
> PETERSON: Okay. Alright I'm in. From the first time we talked about it, it was—
> SMITH: Huh?

7

PETERSON: From the first time we talked about it, there was no turnin' back.
SMITH: Alright.
PETERSON: If I get some booze in here we'll celebrate that night.
SMITH: You know this shit's gonna be all over the news.
PETERSON: Oh. This is like the, oh yeah.
SMITH: This is about to be huge.
PETERSON: But the first thing they will identify him as the guy that got me. That's what he's known for, that's what he'll that's—that—the guy that prosecuted Drew, Drew Peterson."

¶ 27 FBI Agent Brian Clark testified that in August 2014, the Will County State's Attorney's Office asked the FBI to investigate a threat on Glasgow's life. He reviewed an interview of Smith and then conducted his own interview at the Stateville prison on September 2, 2014. Smith offered to wear a recording device. Clark testified that he offered nothing to Smith, and Smith asked for nothing in return at that time. The FBI agreed to assist with the investigation and Clark was the lead investigator. Clark testified that neither Glasgow nor anyone from his office directed the investigation. Clark was present when Smith met with a Will County judge at the Stateville prison. He testified that he believed the purpose of the judge's interview was to assess Smith's credibility. Clark testified that the FBI provided the recording devices and handled all technical details. The IDOC then gave the recording devices to Smith, who used them from November 13, 2014, through December 3, 2014. Clark testified that when the investigation ended, they moved Smith to another prison for his safety, and subsequently transferred him to a federal prison.

¶ 28 The defendant called three witnesses at trial. All three witnesses were inmates. Jesus Padilla was serving a sentence at the Menard prison and knew both the defendant and Smith. The trial court sustained an objection to a question about whether Smith had a reputation for honesty. Albert Chavez was also serving a prison sentence at Menard. He knew both the defendant and Smith. He testified that he stopped hanging out with the defendant because "they were running a scam," which he explained was something that inmates do to get what they want. Finally, Jacob

8

Bohanon testified that he was Smith's codefendant. He testified that he had known Smith for a year or two before prison and while they were imprisoned at Menard. He testified that Smith had a reputation for being untruthful and that he would lie most of the time.

¶ 29    On May 31, 2016, the jury found the defendant guilty of both solicitation of murder for hire and solicitation of murder. The court found that the second charge merged with the first. The defendant timely filed a motion for a new trial or judgment notwithstanding the verdict. On July 29, 2016, the court held a hearing on that motion followed by a sentencing hearing. The court denied the defendant's motion and sentenced him to a prison term of 40 years on the solicitation of murder for hire conviction. The defendant timely filed a motion to reconsider the sentence. The trial court denied the motion on December 15, 2016.

¶ 30    The defendant subsequently filed this timely appeal. We will discuss other relevant facts in the analysis section of this order as necessary for a full examination of the issues raised by the defendant.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, the defendant raises numerous issues. He first argues that the State failed to prove an element of solicitation of murder for hire beyond a reasonable doubt. He next argues that the trial court erred by denying his motion to suppress the eavesdropping recordings, by not complying with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and by allowing the admission of overly prejudicial other-crimes evidence. Finally, he argues that he was denied a fair trial due to the cumulative effect of these and other errors in the case.

¶ 33                    A. Sufficiency of the Evidence Supporting Conviction

¶ 34    The defendant was charged with two crimes: solicitation of murder for hire (720 ILCS 5/8-1.2(a) (West 2014)) and solicitation of murder (*id*. § 8-1). The defendant argues that this court

should reverse his conviction for solicitation of murder for hire because the State failed to prove all elements of the offense. Specifically, he contends that the State failed to prove that he "procured another" to commit the murder. We disagree.

¶ 35    Every person accused of a crime is protected by the due process clauses of the federal and state constitutions. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364 (1970). The State has the burden of proving each element of the crime charged beyond a reasonable doubt. *People v. Weinstein*, 35 Ill. 2d 467, 470 (1966). In reviewing the sufficiency of the evidence, the reviewing court must ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Jackson*, 232 Ill. 2d 246, 280 (2009) (quoting *Jackson v. Virginia*, 443, U.S. 307, 318-19 (1979)). Although the defendant frames this issue in terms of the "sufficiency of the evidence," his argument raises a question of statutory interpretation because it focuses on the meaning of the term "procure." A reviewing court considers issues of statutory interpretation with a *de novo* standard of review. *In re Q.P.*, 2015 IL 118569, ¶ 14.

¶ 36    We first review the language and elements of the crime, solicitation of murder for hire. Section 8-1.2 of the Criminal Code of 2012 (Criminal Code) states: "A person commits the offense of solicitation of murder for hire when, with the intent that the offense of first degree murder be committed, he or she procures another to commit that offense pursuant to any contract, agreement, understanding, command, or request for money or anything of value." 720 ILCS 5/8-1.2(a) (West 2014).

¶ 37    The defendant contends that the State failed to prove the element of "procurement." He does not appear to dispute that the State's proof was sufficient if the statute defining the offense is

construed to encompass an "agreement" in which the individual solicited to commit the murder feigns agreement. Instead, the defendant argues that the word "procure" requires the State to prove that both he and the person he solicited had the intent to commit first degree murder.

¶ 38    The term "procure" is not defined in the Criminal Code. When a term is not defined in the statute, it is presumed that the legislature intended the term to have its ordinary and popularly understood meaning. *People v. Cardamone*, 232 Ill. 2d 504, 513 (2009). To determine the ordinary and popularly understood meaning, we look to Black's Law Dictionary for its definition. Black's Law Dictionary defines "procure" as follows: "to obtain something by special effort or means; to achieve or bring about a result; or to obtain a sexual partner for another." Black's Law Dictionary (10th ed. 2014). The defendant argues, and we agree, that the term "procure" simply means "to obtain."

¶ 39    The defendant's argument is that the State cannot establish the procurement element of the solicitation of murder for hire charge unless it proves that both the defendant and the hired individual had the requisite intent to commit first degree murder. Because Antonio Smith was feigning his agreement to the murder for hire plot, the defendant contends that the State did not establish the required element that Smith also intended to kill Glasgow. We are not persuaded.

¶ 40    Looking at the plain language of the statute, we disagree with the defendant's interpretation of the statute. By reviewing the sentence structure, we find that the word "procure" is directly tied to the defendant's intent, as evidenced by its placement in the sentence. The statute is worded as follows: "A person commits the offense *** when, with the intent that the offense of first degree murder be committed, he or she procures another to commit that offense ***." 720 ILCS 5/8-1.2(a). The requisite intent to commit first degree murder is clearly meant to be the

11

defendant's mental state and not necessarily that of the person hired to commit the murder due to the placement of the intent phrase within the sentence.

¶ 41    Furthermore, Illinois case law has established that solicitation of murder for hire only requires a unilateral agreement. In *People v. Breton*, 237 Ill. App. 3d 355 (1992), the court upheld a solicitation of murder for hire conviction when there was only a unilateral agreement. *Id.* at 362. The defendant, while in jail awaiting trial on drugs and weapons offenses, sought a hitman to kill a former associate who was about to testify against the defendant at trial. *Id.* at 357. The defendant's cellmate contacted authorities, and two investigators for the county state's attorney's office posed as hitmen over the phone. *Id.* at 358. After the defendant paid the investigators to murder the former associate, the defendant was charged and convicted of solicitation of murder for hire. *Id*. at 359.

¶ 42    On appeal in *Breton*, the defendant argued that the State could not prove the "agreement" part of the solicitation of murder for hire statute because the state investigators never intended to commit the murder. *Id.* The appellate court affirmed the conviction, holding that the agreement language of the statute only required one person to agree. *Id*. The court stated:

> "[T]he solicitation of murder for hire statute does not require actual agreement between a defendant and another when the solicitation is pursuant to an agreement. Procurement of another to commit murder pursuant to an agreement where a defendant agrees with a government agent feigning agreement is sufficient to support a conviction of solicitation of murder for hire." *Id.* at 362.

The court distinguished the solicitation statute from the conspiracy statute, the latter of which requires a bilateral agreement. *Id.* at 360 (citing *People v. Foster*, 99 Ill. 2d 48, 55 (1983)). "Because solicitation statutes embrace situations in which one could be convicted of conspiracy under the unilateral theory, solicitation statutes do not require bilateral agreements." *Id.* at 362. Although both statutes use the word "agreement," if a bilateral agreement was required for

12

solicitation as is required for conspiracy, then there would not have been a reason for the legislature to have created the separate solicitation criminal statute. *Id.*

¶ 43    We also find that the Illinois Supreme Court's earlier analysis in *Foster* is significant in establishing that a bilateral intent was not required for a solicitation charge. In *Foster*, the defendant met with a man named John Ragsdale about committing a robbery. 99 Ill. 2d at 50. Ragsdale pretended to agree to commit the robbery and then informed the police of the defendant's plan. *Id.* Ragsdale and the defendant were arrested outside of the victim's house based upon the information Ragsdale provided to police. *Id.* The defendant was convicted of conspiracy to commit armed robbery. *Id.* On appeal, the appellate court reversed his conviction, holding that Illinois required the agreement of two persons to satisfy the elements of a conspiracy charge. *Id.* Because Ragsdale had never actually agreed, there was no conspiracy. *Id.*

¶ 44    In affirming the appellate court's decision, the Illinois Supreme Court emphasized that Illinois solicitation laws already encompass the unilateral theory. *Id.* at 53. The court stated: "Illinois does have a solicitation statute which embraces virtually every situation in which one could be convicted of conspiracy under the unilateral theory. *** There would appear to have been little need for the legislature to adopt the unilateral theory of conspiracy in light of the existence of the solicitation statute." *Id.*

¶ 45    Based on the language in *Foster* and *Breton*, Illinois courts interpret the solicitation statute as only requiring a unilateral agreement. We note that both cases were decided almost 30 years ago, and the Illinois legislature has not updated the statutes to clarify this statutory language. This "lends considerable support to the conclusion that a bilateral theory of conspiracy was intended." *Foster*, 99 Ill. 2d at 55.

13

¶ 46    Factually, we find that the *Breton* case is quite similar to this case. Here, as in *Breton*, the defendant was in prison and sought to have someone murdered because he believed that individual was interfering with his legal proceedings. Like the state's attorney investigators in *Breton*, Smith never intended to kill the target. Like the investigators in *Breton*, he was instead working with authorities to build a case. Because the solicitation for murder statute does not mandate a bilateral intent or agreement, the State was not required to prove that Smith intended that the murder be carried out. We therefore reject the defendant's argument that the State failed to prove an element of the offense.

¶ 47                    B. Denial of the Motion to Suppress the Overhear Evidence

¶ 48    The defendant raises three separate bases for his claim that the trial court should have granted his motion to suppress the overhear recordings: (1) Will County State's Attorney James Glasgow had a conflict of interest when he authorized the eavesdropping applications because he was the alleged victim; (2) the judge who granted the eavesdropping applications was not impartial because he participated in the investigation by personally interviewing Smith almost three weeks before he received the first eavesdropping application; and (3) the eavesdropping recordings were not obtained in conformity with the authorization order because they were obtained by the FBI and the IDOC instead of by the state's attorney's investigator, Louis Silich, the person the trial court authorized to conduct the eavesdropping. The defendant also argues that he received ineffective assistance of counsel in connection with his motion to suppress. We reject these claims.

¶ 49    Before we address these issues, we briefly review the applicable eavesdropping statutes and their purpose. " 'The fundamental purpose of *** eavesdropping statutes is to prohibit unauthorized eavesdropping and the use of evidence gained by such eavesdropping.' " *People v. Harris*, 2020 IL App (3d) 190504, ¶ 23 (quoting *In re Cook County Grand Jury*, 113 Ill. App. 3d

14

639, 646 (1983)). " 'The spirit and purpose of the [Illinois] eavesdropping statute are not only to ensure that all eavesdropping is subject to judicial supervision but to prevent unwarranted intrusions into an individual's privacy.' " *Id.* (quoting *People v. Monoson*, 75 Ill. App. 3d 1, 8 (1979)).

¶ 50    Section 108A-1 *et seq.* of the Code of Criminal Procedure of 1963 (Code) provides the guidelines for use of an eavesdropping device when one party has consented. 725 ILCS 5/108A-1 *et seq.* (West 2014). The use of an eavesdropping device to record all or part of a conversation is prohibited unless either all parties to the conversation consent or one party to the conversation consents and judicial authorization is obtained in accordance with the statute's directives. *Id.* § 108A-1.

¶ 51    The State can file an application to obtain an order authorizing the use of an eavesdropping device. *Id.* An eavesdropping application must include: (1) the identity of the investigative officer making the application and the state's attorney authorizing the application, (2) a statement of relevant facts, (3) the period of time the device will be used, and (4) a statement of all previous applications made involving the same persons in the present application. *Id.* § 108A-3. The eavesdropping application statute and its requirements are strictly construed. *People v. Cunningham*, 2012 IL App (3d) 100013, ¶ 22.

¶ 52    We note that there can be no reasonable expectation of privacy when one party to a conversation consents to its recording. 725 ILCS 5/108A-1 (West 2014); *People v. Herrington*, 163 Ill. 2d 507, 510 (1994). In fact, " 'no eavesdropping occurs where an individual to whom statements are made or directed records them, even without the knowledge or consent of the person making the statements, because the declarant does not intend to keep his statements private *vis-à-*

15

*vis* that individual.' " *Herrington*, 163 Ill. 2d at 510-11 (quoting *Bender v. Board of Fire & Police Commissioners*, 183 Ill. App. 3d 562, 565 (1989)).

¶ 53    Although a defendant does not need to consent to a recorded conversation for it to be admissible, there are methods to prevent the recording from coming into evidence under certain circumstances. Section 108A-9 of the Code provides that "[a]ny aggrieved person in any judicial or administrative proceeding may move to suppress the contents of any recorded conversation or evidence derived therefrom" on the following grounds: "(1) the conversation was unlawfully overheard and recorded; (2) the order of authorization or approval under which the device was used or a recording made was improperly granted; or (3) the recording or interception was not made in conformity with the order of authorization." 725 ILCS 5/108A-9(a)(1)-(3) (West 2014). Suppression is required if there is a failure to satisfy one of the statutory requirements and that failure substantially implicates the legislative intent of limiting eavesdropping devices. *Cunningham*, 2012 IL App (3d) 100013, ¶ 22. Factors used to determine whether suppression is warranted are whether: "(1) the particular safeguard is a central safeguard in the legislative scheme to prevent abuses; (2) the purpose the particular procedure was designed to accomplish has been satisfied in spite of the error; and (3) the statutory requirement was deliberately ignored and, if so, whether the government gained a tactical advantage." *Id.* (citing *People v. Nieves*, 92 Ill. 2d 452, 458-59 (1982)).

¶ 54    On appeal from a denial of a motion to suppress evidence where the motion involves factual findings, a reviewing court will not overturn those findings unless they are manifestly erroneous. *People v. Calgaro*, 348 Ill. App. 3d 297, 299-300 (2004). If there are no facts in dispute, the trial court's suppression ruling turns solely on legal issues, which are reviewed *de novo. Id.* at 300.

16

¶ 55                    1. Conflict of Interest of State's Attorney

¶ 56    The defendant argues that the eavesdropping authorizations were improperly granted because the Will County State's Attorney, James Glasgow, the alleged victim in this case, authorized the applications. He further argues that the trial court should have suppressed the eavesdropping recording because of the inherent conflict of interest resulting from the intended victim involving himself in the process of obtaining the initial authorization.

¶ 57    In Illinois, the person authorized to seek an eavesdropping authorization is the state's attorney or his or her assistant. 725 ILCS 5/108A-1 (West 2014). Glasgow fulfilled this requirement with the October 2014 application, and Chief Deputy Grey, acting with Glasgow's authority, applied for the November 2014 extension authorization.

¶ 58    The language of section 108A-1 of the Code provides no support for the defendant's claim that the alleged victim's involvement in authorizing the application for an eavesdropping order was inappropriate. While the eavesdropping statute must be strictly construed, suppression is only required when one of the statutory requirements is not satisfied and that failure substantially involves legislative intent. *Cunningham*, 2012 IL App (3d) 100013, ¶ 22. Here, the statute does not require that the applicant or the state's attorney authorizing the application disclose any potential conflicts of interest, nor does it provide any other rules governing conflicts of interest. Thus, Glasgow's participation in the process did not conflict with any of the express statutory requirements.

¶ 59    The defendant argues, however, that Glasgow's participation ran afoul of the purpose of the legislation governing eavesdropping applications. He correctly points out that the regulatory scheme "contemplates supervision and control by the State's Attorney" (*People v. Sylvester*, 86 Ill. App. 3d 186, 199 (1980)) to prevent "unwarranted intrusions into an individual's privacy"

17

(*Monoson*, 75 Ill. App. 3d at 8). However, Glasgow, acting as the Will County State's Attorney, did not do more than participate in the process of filing the application for the eavesdropping order. The fact that Glasgow was the intended victim of the defendant's alleged plot to have him killed, without more, does not provide sufficient grounds for suppression of the recording.

¶ 60    We next examine what constitutes a prosecutorial conflict of interest. A prosecutor has a conflict of interest where the attorney: (1) is interested as a private individual in the litigation, (2) is an actual party to the litigation, and (3) where the attorney's continued participation would create the appearance of impropriety. *People v. Bickerstaff*, 403 Ill. App. 3d 347, 352 (2010).

¶ 61    The defendant provides minimal legal support for his contention that the alleged conflict of interest would warrant suppression. After careful review, we find that the cases he cites are factually inapposite as they involved orders denying requests for the appointment of a special prosecutors. Here, the defendant did not seek the appointment of a special prosecutor; instead, he asked the trial court to suppress the eavesdropping evidence because of the alleged conflict of interest.

¶ 62    In *People v. Lang*, 346 Ill. App. 3d 677, 678 (2004), the defendant was in court for a charge of driving with a revoked license. After this proceeding, an assistant state's attorney followed the defendant to a parking garage and watched the defendant get into his vehicle and drive away. *Id.* at 679. The defendant was subsequently charged with another count of driving with a revoked license. *Id.* The trial court denied the defendant's motion to appoint a special prosecutor. *Id.* The defendant was convicted after a jury trial. *Id.* The appellate court reversed based on the conflict of interest between the assistant state's attorney, who became a witness to the crime, and the county state's attorney's office. *Id.* at 686. The court found that the situation created an appearance of impropriety and that a special prosecutor should have been appointed. While holding that there is

18

no *per se* requirement for a special prosecutor appointment when a prosecutor becomes a witness in a criminal case, the court stated: "Although the [prosecutor's] pursuit of the defendant was not wrong in itself, his aggressive behavior toward the defendant created the appearance that the State's Attorney's office was obsessed with finding evidence against the defendant to obtain a conviction against him at all costs." *Id.* at 684; see also *Bickerstaff*, 403 Ill. App. 3d 347 (holding that the appointment of a special prosecutor was not warranted in a situation where the prosecutor made extrajudicial statements about a predecessor's handling of the defendant's case in the context of a political campaign because those actions did not raise an appearance of impropriety).

¶ 63    The State argues that even if Glasgow's involvement with the initial authorization presented a conflict of interest, the eavesdropping statute requires an additional procedural step that serves to remedy any perceived conflict. See 725 ILCS 5/108A-1. After the application is prepared, the state's attorney must present the document for review and approval by a circuit judge. *Id.* Without that additional step, the application alone would not automatically result in an eavesdropping authorization. We agree with the State. The circuit judge's assessment represents an important independent procedural step in the process and provides the necessary oversight.

¶ 64    Additionally, we note that the remedy for a conflict of interest would have been the appointment of a special prosecutor—not suppression of evidence. Suppression is required only "where there is a failure to satisfy any of the statutory requirements that directly and substantially implement the legislative intent to limit the use of eavesdropping devices." *People v. Roake*, 334 Ill. App. 3d 504, 514 (2002) (citing *Nieves*, 92 Ill. 2d at 458). When interpreting statutes, such as the eavesdropping statutes at issue here, courts should not read into the statutes conditions and requirements that are not there. *People v. McClure*, 218 Ill. 2d 375, 382 (2006).

19

¶ 65 Here, the defendant does not argue that the State's application for an eavesdropping authorization was meritless or that any of the statutory requirements for an eavesdropping authorization were violated. *Cunningham*, 2012 IL App (3d) 100013, ¶ 17. In this case, there is no question that the application was in writing on oath or affirmation to a circuit judge and (1) contained the identity of the investigator and the state's attorney who authorized the application; (2) contained a statement of the relevant facts and circumstances upon which the applicant relied including details regarding the felony to be committed, the type of communication to be monitored, the identity of the consenting party to the eavesdropping device, and the identity of the person to be overheard on the eavesdropping device; (3) contained a statement of the period of time for which the device will be maintained; and (4) contained a statement of any previous applications. 725 ILCS 5/108A-3.

¶ 66 In addition to the statutory compliance with the eavesdropping statute, we note that while Glasgow filed the initial application, the persons involved in setting up, participating, and recording the conversations were not part of Glasgow's office. The entire production was staffed by outside state and federal agencies. Therefore, we find that any alleged impropriety or lack of impartiality is mitigated by the fact that Glasgow's involvement ended after he filed the application for the authorization.

¶ 67 Overall, we find no factual or legal rationale for suppression of the eavesdropping evidence. There was no statutory violation of the eavesdropping application process. While Glasgow was both the intended victim and the state's attorney authorizing the application, we agree with the State's argument that in cases with an alleged conflict of interest, courts should apply a more stringent standard when the defendant seeks suppression of evidence rather than the appointment of a special prosecutor. See *People v. Gallegos*, 251 P.3d 1056, 1062-63 (Colo. 2011)

20

(holding that disqualification standards are purposefully overinclusive because the remedy merely results in substitution of the challenged official). We find that Glasgow's potential conflict of interest in applying for an eavesdropping order, without more, did not warrant suppression.

¶ 68                                2. Judicial Impartiality of Judge Schoenstedt

¶ 69    The defendant next argues that Judge Schoenstedt was not impartial because he participated in the investigation by personally interviewing Smith 20 days prior to receiving the first eavesdropping authorization application. As such, he contends, the eavesdropping orders were improperly granted. The defendant does not allege that Judge Schoenstedt violated any section of the eavesdropping statute when he signed the orders. He also does not argue that there was any deficiency in the eavesdropping application. 725 ILCS 5/108A-3(a) (West 2014). Further, he does not assert that there was a lack of "reasonable cause" needed to justify the eavesdropping authorization orders. *Id.* § 108A-4. Finally, the defendant acknowledges that he has found no case law supporting this argument.

¶ 70    The procedure for obtaining judicial approval for an eavesdropping authorization order is found in section 108A-3 of the Code. *Id*. § 108A-3. A judge may grant an order of authorization if the application meets the statutory content requirements. *Id*. § 108A-3(a). A judge may ask the applicant to furnish additional testimony, witnesses, or evidence in support of the application. *Id.* § 108A-3(b). Section 108A-4 of the Code provides that the judge may authorize or approve the use of the eavesdropping device where it is found that: (a) one party to the conversation has or will have consented to the use of the device; (b) there is reasonable cause for believing that an individual is committing, has committed, or is about to commit a felony under Illinois law; (c) there is reasonable cause for believing that particular conversations concerning that felony offense will

21

be obtained through such use; and (d) for any extension authorized, that further use of a device is warranted on similar grounds. *Id.* § 108A-4.

¶ 71    As stated earlier in this order, suppression of eavesdropping evidence is proper when the underlying order of authorization was improperly granted. *Id.* § 108A-9(a)(2). "Suppression is only required where there is a failure to satisfy any of the statutory requirements that directly and substantially implement the legislative intent to limit the use of overhears." *Cunningham*, 2012 IL App (3d) 100013, ¶ 22 (citing *People v. Ellis*, 122 Ill. App. 3d 900, 904 (1984)).

¶ 72    The defendant argues that this court should read an impartiality requirement into the eavesdropping statutes. While it is arguable that the statutes contain evidence of judicial oversight as a requirement, there is no requirement of impartiality. See 725 ILCS 5/108A-3, 108A-4 (West 2014). Therefore, suppression on the basis that the State did not comply with the statutory requirements is not warranted. However, the defendant urges this court to find that impartiality is nonetheless a "necessary assumption" of judicial oversight. The defendant correctly argues that judicial oversight is a central safeguard to the eavesdropping statutes' legislative scheme. *Sylvester*, 86 Ill. App. 3d at 199. He argues that this necessarily implies that the judge must be impartial. *Id.* The problem with his argument is that we are not convinced that Judge Schoenstedt was anything other than fair and impartial.

¶ 73    Trial judges are presumed to be impartial; however, this presumption can be rebutted when a judge's conduct erodes public confidence in the role of the judiciary. See *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 31; Ill. S. Ct. R. 62(A) (eff. Oct. 15, 1993) ("A judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."). While the standard is vaguely worded, the defendant's argument draws a tenable inference across other statutes and

22

rules: a court's decision must not be influenced by the judge's personal, private, or perverse involvement and interest in the case. Ill. S. Ct. R. 62(B). Judges must therefore be "neutral and detached." See *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972); see also *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326 (1979) (where the judge led the entire investigation uncovering new information alongside law enforcement); *State v. Wilson*, 879 P.2d 683, 684 (Mont. 1994) (where the judge assisted the officers in building their case by helping them find the open safe and discussing its link to the suspect). Federal courts and the courts of other states divide these cases into two categories: (1) cases where magistrates have a substantial personal interest in the outcome and (2) cases where magistrates have acted primarily in a law enforcement role. *Gallegos*, 251 P.3d at 1065.

¶ 74    Here, the defendant does not allege that Judge Schoenstedt had a substantial personal interest in the outcome. Instead, he argues that Judge Schoenstedt's personal involvement in the case was akin to being an active participant in a law enforcement role. However, in the cases cited by the defendant, a motion to suppress based on judicial impartiality succeeded only when the judge actively engaged in the investigative process alongside police officers. See *Lo-Ji Sales, Inc.*, 442 U.S. at 321-24 (where judge accompanied officers on the execution of the search warrant and directed the officers to seize other items that he later added to the warrant); *Wilson*, 879 P.2d at 684-85 (where justice of the peace traveled with the sheriff to recover evidence of a crime and discussed the evidence and the investigation with the sheriff before issuing a search warrant). As the Montana Supreme Court held in *Wilson*: "[O]nce the justice of the peace became an active participant in the police investigation, he was no longer an impartial magistrate and, therefore, he could not issue a search warrant." *Wilson*, 879 P.2d at 685.

23

¶ 75    Given the facts in this case, we find that Judge Schoenstedt's involvement did not rise to the level of an "adjunct law enforcement officer." Section 108A-3(b) of the Code states that "[t]he judge may request the applicant to furnish additional testimony, witnesses, or evidence in support of the application." 725 ILCS 5/108A-3(b) (West 2014). Judge Schoenstedt thus had the authority to ask that Smith be interviewed before ruling on the application. Here, of course, the interview occurred before the application was filed. Even assuming this was inappropriate, however, we conclude that the defendant's claim of error fails.

¶ 76    An eavesdropping recording will be suppressed if (1) a statutory requirement has not been satisfied, and that requirement relates to a central safeguard in the legislative scheme, (2) the purpose for which the particular procedure was designed was not accomplished, and (3) the statutory requirement was deliberately ignored, and the prosecution gained a tactical advantage as a result. *Cunningham*, 2012 IL App (3d) 100013, ¶ 22. Here, the defendant cannot show that a statutory requirement was deliberately ignored or that the prosecution gained a tactical advantage. See *Nieves*, 92 Ill. 2d at 458-59. FBI Agent Clark testified, the authorization application was not immediately filed after Judge Schoenstedt's interview because if the authorization had been granted at that time, they would not have had enough time to move Smith to Menard and get everything set up. Instead, Smith was moved to Menard and then the Will County State's Attorney's Office filed its application for an authorization order. We find that the 20-day delay in filing the application did not provide the State with any tactical advantage. Although conducting the interview before the application was filed is seemingly out of order, Judge Schoenstedt's interview did not work to the State's advantage and does not mandate a conclusion that he lacked impartiality. We therefore conclude that the defendant's argument is without merit.

24

¶ 77    3. Eavesdropping Recordings Obtained by Organizations Not Named in Applications

¶ 78    The defendant finally argues that the recordings should have been suppressed because they were not obtained by Louis Silich, the investigator listed in the State's applications. Instead, the recordings were obtained by the FBI with assistance from IDOC staff. The State contends that the defendant has forfeited this argument and that the claim does not constitute plain error.

¶ 79    The defendant did not include this issue in his motion to suppress, offer a contemporaneous objection, or raise the issue in his posttrial motion. Therefore, he has forfeited the issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Denson*, 2014 IL 116231, ¶ 18.

¶ 80    The defendant asks this court to consider the issue as plain error. The plain error doctrine can be used in criminal cases to review an unpreserved error "if either [(1)] the evidence was closely balanced or [(2)] the error was of such magnitude that the defendant was denied a fair trial." *People v. Hindson*, 301 Ill. App. 3d 466, 473-74 (1998) (citing *People v. Petitt*, 245 Ill. App. 3d 132, 139 (1993)); *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). In plain error review, the defendant bears the burden of persuasion. *Thompson*, 238 Ill. 2d at 613 (citing *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009)).

¶ 81    "The first step of plain-error review is determining whether any error occurred." *Id.* (citing *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009)). To make this determination, we return to the language of section 108A-3 of the Code: "Each application shall include the following: (1) the identity of the investigative or law enforcement officer making the application and the State's Attorney authorizing the application[.]" 725 ILCS 5/108A-3(a)(1) (West 2014). The statute does not require the State to include the name of the person who will *utilize* the eavesdropping authorization order; it requires only that the State provide the name of the person making the

25

application. We find that the State's application complied with section 108A-3 of the Code. Therefore, there was no error, much less plain error.

¶ 82                                    4. Ineffective Assistance of Counsel

¶ 83    The defendant argues that his trial counsel was ineffective because he failed to file a motion to reconsider the court's denial of his motion to suppress. The defendant contends that there was additional information that was presented during trial that had not been available to him and his attorney when the motion to suppress was presented and argued. He argues that this new evidence was significant and provided further support for his motion to suppress.

¶ 84    Constitutionally competent assistance is measured by a test of whether the defendant received "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We presume that defense attorneys pursue sound trial strategies. See *id.* at 689. Trial strategies are unsound only when no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies. *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997).

¶ 85    To prevail on an ineffective-assistance-of-counsel claim, "[the] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v. Lefler*, 294 Ill. App. 3d 305, 311 (1998) (citing *Strickland*, 466 U.S. at 694). The term "reasonable probability" has been defined to mean "a probability sufficient to undermine confidence in trial's outcome." *Id.* at 311-12 (citing *Strickland*, 466 U.S. at 687). A finding that professional errors have been committed is not necessarily dispositive. We must examine the issue from the perspective of whether the defendant received a fair trial, despite an attorney's shortcomings. *Id.* at 312. In that context, a fair trial means "a trial resulting in a verdict worthy of confidence." *Id.* (citing *People v. Moore*, 279 Ill. App. 3d 152 (1996)).

26

¶ 86    Here, the additional supporting evidence adduced during trial came from the testimony of Glasgow and FBI Agent Clark. Glasgow testified about his history with the defendant and about being the target of the defendant's alleged murder plot. He further testified that he signed the application for the eavesdropping authorization order to provide safety for his family. FBI Agent Clark testified that Judge Schoenstedt interviewed Smith for a slightly longer period than what was stated in the application document. Glasgow and FBI Agent Clark testified about how the FBI conducted the eavesdropping with the assistance of the IDOC.

¶ 87    The defendant argues that because of this "new" evidence, the trial court would likely have granted a motion for reconsideration, and that therefore, the defendant's trial attorney was ineffective. We disagree.

¶ 88    We first note that the trial court was already aware that Glasgow was the defendant's intended victim and of the associated history between the two men. Moreover, we analyzed the substance of the defendant's arguments about Glasgow's alleged impartiality earlier in this order and we determined that those arguments had no merit. Glasgow was the state's attorney. The state's attorney needed to authorize and sign the application before presentation to the judge. We concluded that any conflict of interest with Glasgow's involvement in signing the eavesdropping application was insufficient to warrant suppression of the evidence. Further, we find that any discrepancy between the time Judge Schoenstedt actually spent interviewing Smith versus the length of time was listed in the application is simply not material. Thus, if the defendant's trial attorney had filed a motion to reconsider, the outcome would not have changed. An attorney who decides to forego filing a meritless motion is not ineffective. See *People v. Bailey*, 364 Ill. App. 3d 404, 408-09 (2006); *People v. Johnson*, 206 Ill. 2d 348, 378 (2002). We find no basis to conclude that the defendant's attorney was ineffective as alleged.

27

¶ 89              C. Failure to Comply With Illinois Supreme Court Rule 431(b)

¶ 90    The defendant's next argument is based on the court's questioning of prospective jurors during *voir dire* pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Rule 431(b) requires courts to question jurors about their understanding and acceptance of four basic principles of law known as the *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472 (1984)). Those principles are that (1) the defendant is presumed innocent, a presumption that stays with him throughout the proceedings; (2) the State is required to prove the defendant guilty beyond a reasonable doubt; (3) the defendant is not required to prove his innocence; and (4) the defendant is not required to testify, and, if he chooses not to do so, jurors may not draw any negative inferences from this fact. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010) (citing Ill. S. Ct. R. 431(b) (eff. May 1, 2007)); see also *Zehr*, 103 Ill. 2d at 477. The court is required to give all prospective jurors an opportunity to indicate whether they both accept and understand each of these four principles. *Thompson*, 238 Ill. 2d at 607.

¶ 91    In this case, the trial judge asked all prospective jurors whether they accepted the principles concerning the State's burden of proof, the presumption of innocence, and the defendant's right not to present evidence. The trial court did not ask the prospective jurors if they understood these three *Zehr* principles. Thus, there is no dispute that the court did not fully comply with Rule 431(b). See *People v. Wilmington*, 2013 IL 112938, ¶ 32. There is also no dispute, however, that the defendant forfeited review of this claim by failing to object during *voir dire*. The defendant concedes that he has forfeited his Rule 431(b) issue because he did not raise the issue in the trial court by making a contemporaneous objection and because he did not raise this issue in his posttrial motion. *Enoch*, 122 Ill. 2d at 186; *Denson*, 2014 IL 116231, ¶ 18. Thus, the question for us is whether plain error review of his claim would be appropriate.

28

¶ 92     As stated earlier in this order, the plain error doctrine allows us to review a claim that has been forfeited if the evidence was closely balanced or the error was so grave that the defendant was denied a fair trial. *Thompson*, 238 Ill. 2d at 613 (quoting *Piatkowski*, 225 Ill. 2d at 565). However, the Illinois Supreme Court has held that plain error review of Rule 431(b) errors is appropriate only under the closely-balanced prong of the plain error test. *People v. Sebby*, 2017 IL 119445, ¶ 52. Here, the defendant argues the evidence was closely balanced. We disagree.

¶ 93     The question we must answer is whether the evidence was so closely balanced that "the error alone severely threatened to tip the scales of justice." *Id.* ¶ 51. This inquiry involves "an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* ¶ 53. The defendant has the burden of persuading this court that the evidence was close enough to meet this standard. *People v. Choate*, 2018 IL App (5th) 150087, ¶ 52.

¶ 94     In support of his assertion that the evidence in this case was closely balanced, the defendant argues that the evidence presented by both sides was credible, and that the State's case was not more plausible than his case. The State counters that it presented compelling evidence of the defendant's guilt.

¶ 95     On appeal, this court "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53 (citing *People v. Belknap*, 2014 IL 117094, ¶¶ 52-53). The determination of whether evidence in a criminal case is "closely balanced" is necessarily based in fact. Accordingly, a reviewing court must assess all evidence on the elements of the charged offense as well as all evidence regarding witness credibility. *Id.*

29

¶ 96    We begin our analysis by reviewing the elements of the charges at issue: solicitation of murder for hire and solicitation of murder. The State had the burden to prove that the defendant (1) with intent that first degree murder be committed, (2) sought another to commit that murder, and (3) solicited another pursuant to an agreement or request for money or anything of value. 720 ILCS 5/8-1(b), 8-1.2(a) (West 2014). The evidence provided by the prosecution in support of these elements consisted primarily of the eavesdropping recordings. The parties also do not disagree regarding the content of those recordings.

¶ 97    Having carefully reviewed the record on appeal, we find that the State presented overwhelming evidence of the defendant's guilt at trial. The recordings were a valuable evidentiary tool that provided the jury with the opportunity to hear the defendant's unguarded words. The recordings established that the defendant asked Smith to assist him in having Glasgow killed. They established that Smith sent the defendant a photograph of Glasgow that was allegedly taken by Smith's associates. The defendant identified Glasgow in the photograph. The defendant and Smith both understood that Smith's uncle was the person who would kill Glasgow, and that the murder would occur by Christmas. At one point on the recordings, the defendant cautions Smith to "stop talking about it," when asked about the best method to kill Glasgow. The recordings further established that the defendant agreed to provide Smith with $10,000 for the person who would carry out Glasgow's murder, and that he would otherwise "take care" of Smith and his family.

¶ 98    In the recorded conversations, the defendant also revealed his intent to have Glasgow killed through his expression of the following motives: he believed that Glasgow was conspiring with the appellate court and he would lose his appeal in the Savio murder case; the defendant was angry with Glasgow for prosecuting him for Savio's murder; the defendant believed that Glasgow got the defendant's son, Stephen, fired from his job; the defendant believed that Glasgow was trying

to get the defendant's police pension revoked; and the defendant feared that Glasgow would prosecute him for Stacy Peterson's alleged abduction and/or murder.

¶ 99    The defendant argues, however, that the testimony of two fellow inmates, Jesus Padilla and Albert Chavez, undermined the State's case, and that the evidence was therefore closely balanced. The defendant argues that the testimony of both witnesses compromised the reliability of Smith's testimony regarding the murder plot. However, from our review of the record, we find that neither Padilla nor Chavez definitively stated that Smith was being untruthful about his alleged conversations with the defendant about the Glasgow plot. While their testimony on the intricacies of prison life may have indicated that Smith was not generally honest or credible, it did not directly refute the claims made by the State's witnesses. Moreover, as we have already discussed at length, the recordings themselves provided powerful evidence of the defendant's guilt that could not be undermined by attacks on Smith's credibility.

¶ 100   The defendant alternatively argues that Smith and Glasgow were not credible witnesses, and thus the evidence was closely balanced. We disagree. This case was decided by a jury who had the opportunity to hear and evaluate the recorded conversations. The jury had the ability to assess the credibility of the State's witnesses. The defendant did not present any affirmative evidence in his defense or otherwise counter the State's case with irrefutable evidence. He did not provide the jury with any credible alternate versions of the events at issue. The defendant offered no eyewitness testimony about whether he solicited Glasgow's murder, and thus the jury did not have to make credibility determinations. The defendant's case consisted of cross-examination of the State's witnesses and the testimony of fellow inmates about aspects of prison life. We acknowledge that the defendant had no obligation to present evidence in his own defense.

31

However, when the State presents evidence of his guilt that is both overwhelming and unrefuted, he cannot credibly contend that the evidence was closely balanced.

¶ 101   The defendant also argues that when Smith told him that he could only be charged with "solicitation to murder," Smith's usage of the term "solicitation" proved that they never intended to kill Glasgow. The State counters that this requires the court to make assumptions regarding the defendant's state of mind. We find that it makes little sense that the defendant would ask Smith to have Glasgow murdered, and then presume that Smith would not act upon the request. Nothing in the recorded conversations supports this narrative. Given that neither party was seemingly well-versed in the nuances between solicitation and conspiracy at the time of the recording, we find that this argument is uncompelling.

¶ 102   We conclude that the evidence in this case was not closely balanced warranting plain error review. Evidence is deemed closely balanced when the trier of fact was presented with competing and equally plausible versions of the events by other witnesses and proof. See *Sebby*, 2017 IL 119445, ¶¶ 61-63. Here, the record completely discounts that equally plausible versions of the events were presented to the jury. Although the trial court failed to comply with Supreme Court Rule 431(b), the defendant forfeited his right to raise this issue on appeal, and because the evidence in this case was not closely balanced, we will not address the trial court's error on plain error review. *Id.* ¶ 51.

¶ 103                    D. Admission of Other-Crimes Evidence

¶ 104   The defendant next argues that the trial court erred by allowing the admission of evidence that he allegedly murdered his wife, Stacy Peterson. The defendant seemingly acknowledges that the admission of this evidence was probative of his motive and intent to have Glasgow murdered. However, he argues that the State provided more evidence than was necessary to prove his motive

32

and intent. He also argues that the probative value of the State's evidence about Stacy's alleged murder was outweighed by the resulting prejudice.

¶ 105   On appeal, we review a trial court's decision about the admissibility of evidence to determine whether the court abused its discretion. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). A reviewing court will only overturn a trial court's decision if no reasonable person would have taken the view of the trial court, or when the decision was "arbitrary, fanciful, or unreasonable." (Internal quotation marks omitted.) *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 106   Generally, evidence that a defendant committed other crimes is inadmissible to demonstrate his or her propensity to commit the crime charged. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003); see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). This general rule serves to protect a defendant from being convicted by a jury believing that he or she is a "bad person deserving punishment." *Donoho*, 204 Ill. 2d at 170. Despite this general rule, other crimes, wrongs, or acts evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b). Evidence of other crimes is also admissible to show the defendant's dislike for, or attitude towards, the victim. *People v. Kimbrough*, 138 Ill. App. 3d 481, 485 (1985). However, even when other-crimes evidence is relevant, there are limits on its use. Rule 403 of the Illinois Rules of Evidence states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 107   In this case, the State filed a pretrial motion asking the court to allow its introduction of evidence that the defendant was a "suspect/person of interest" in the disappearance of his fourth

33

wife, Stacy. The State sought to introduce this testimony to prove the defendant's motive and intent to have Glasgow killed. From the eavesdropping recordings, the defendant had expressed concern to Smith that Glasgow would prosecute him for Stacy's disappearance. The trial court granted the motion.

¶ 108  At trial, Glasgow and Smith both testified about Stacy. Glasgow testified about the defendant's involvement with Stacy's disappearance as well as the similarities between Stacy's disappearance and the murder of Savio. Glasgow testified that Stacy went missing on October 28, 2007, at a time when she was contemplating ending her marriage to the defendant; that Stacy provided the defendant with an alibi during the Savio investigation; that Savio was found dead in a bathtub on March 1, 2004; and that before Savio's death, she and the defendant divorced and were litigating the disposition of their marital property. Glasgow further testified that at a hearing during the Savio murder trial, the trial court allowed hearsay statements of both Savio and Stacy to be admitted after finding by a preponderance of the evidence that the defendant murdered both women to keep them from testifying against him. Smith testified that the defendant admitted to killing Stacy. The defendant also allegedly told Smith that Glasgow would charge him for Stacy's disappearance.

¶ 109  The defendant argues that although this evidence was relevant for intent and motive purposes, the State's additional testimony about Stacy's disappearance could have "planted an idea in the minds of the jurors that Peterson had killed not one, but two of his wives" and that "[i]f he killed his two wives, he would kill Glasgow." The State counters that the additional evidence was all connected to the defendant's motivations to kill Glasgow—that Glasgow prosecuted the defendant for Savio's murder, that the defendant believed that Glasgow was trying to impact his appeal from the Savio murder conviction, that the defendant believed that Glasgow had his son

34

fired from his job, and that the defendant believed that Glasgow was trying to have his pension revoked. Additionally, the State asserts that the details about Stacy's disappearance were important for context in explaining why the defendant had not yet been charged in that case.

¶ 110   We find that the cases cited by the defendant are distinguishable. In these cases, the trial court allowed a "mini-trial" on the other-crimes evidence where the evidence was repetitively presented in great detail and was therefore excessive to what was required to accomplish the limited purpose for its admission. In *People v. Nunley*, 271 Ill. App. 3d 427 (1995), the defendant was on trial for armed robbery and murder. At trial, the State presented evidence that the defendant killed his mother's dog while attempting to kill his mother. *Id*. at 428. There was no relationship between the two sets of crimes. *Id*. The appellate court reversed the conviction because of the overwhelmingly prejudicial evidence that the defendant killed a dog, the excessive detail of the evidence presented, and the lack of connection between the two sets of crimes. *Id.* at 432-33. The defendant also cites *People v. Thigpen*, 306 Ill. App. 3d 29 (1999), as supportive of his argument. In *Thigpen*, the defendant was on trial for the murder of a gang member. *Id.* at 31. At trial, the State presented evidence that the defendant had previously killed two other members of this same gang. *Id.* at 35. The appellate court reversed the conviction, finding no basis for introduction of evidence of the other two murders, and stated that the extensive details "could only serve to portray the defendant as callous and remorseless." *Id.* at 37.

¶ 111   The defendant also argues that the introduction of testimony about Stacy's disappearance and possible murder was inappropriate because the State presented other evidence establishing motive and intent. When considering the admissibility of other-crimes evidence, the court must consider whether the prosecution has other available evidence to establish the facts at issue in the case. *Id.* at 36-37. The defendant points to the State's evidence that Glasgow successfully

35

prosecuted the defendant for Savio's murder, the defendant's belief that Glasgow could impact his appeal of his murder conviction, the defendant's belief that Glasgow had the defendant's son fired from his job, the defendant's belief that Glasgow was attempting to have the defendant's pension rights revoked, and the defendant's multitude of statements expressing animosity towards Glasgow.

¶ 112   We find that the evidence about Stacy did not subject the defendant to a "mini-trial" on her disappearance and possible death. From the eavesdropping recordings, the jury heard the defendant twice say that Stacy was still alive. In addition to those two statements, Smith made three references to Stacy in his trial testimony. Two of those three references were elicited by the State during direct and redirect examination. Both times the State asked questions with the intent of establishing and emphasizing that the defendant was motivated by fear that Glasgow would charge him with Stacy's murder. In the State's closing and rebuttal arguments, the State emphasized the defendant's fear of prosecution for Stacy's murder to establish motive in this case.

¶ 113   Overall, this case is not analogous to *Nunley* and *Thigpen* where the mini-trial aspect of the other-crimes evidence was clear. In both cases, the State introduced evidence of completely unrelated crimes. *Nunley*, 271 Ill. App. 3d at 432; *Thigpen*, 306 Ill. App. 3d at 31. In *Nunley*, the State could not connect the dog killing to the robbery and murder, and in *Thigpen*, the State was able to connect the defendant's three murder victims because they all belonged to the same rival gang, but was unable to establish that the victims knew each other or were related in any way. In the defendant's case, the two crimes had a connection because of Glasgow's involvement in the potential prosecution of Stacy's alleged murder. Moreover, the other-crimes evidence is related to the charges in this case because it provided evidence of the defendant's motivation to have Glasgow killed.

36

¶ 114　We conclude that the trial court did not abuse its discretion in allowing the limited introduction of other-crimes evidence in this case to establish the defendant's motive and intent to have Glasgow killed. We find that the other-crimes evidence introduced was not more prejudicial than probative. Ill. R. Evid. 403 (eff. Jan. 1, 2011). We note that any danger of undue prejudice was ameliorated here because the trial court provided an instruction directing the jury to consider such evidence for the limited purpose of defendant's motive and intent. *People v. Tolbert*, 323 Ill. App. 3d 793, 800 (2001). "The best way to address the [potential unfair prejudice to the defendant] is to use the limiting instruction contained in Illinois Pattern Jury Instructions, Criminal, No. 3.14 (3d ed. 1992), taking care that the proper limited purpose of the evidence is used." *People v. Harris*, 288 Ill. App. 3d 597, 606 (1997).

¶ 115　　　　　　　　　　　　　　　　E. Cumulative Error

¶ 116　The defendant finally argues that this court should reverse the defendant's conviction and remand for a new trial because he was denied a fair trial due to cumulative error. See *People v. Blue*, 189 Ill. 2d 99, 138 (2000). The defendant argues that the following errors "created a pervasive pattern of unfair prejudice" to his case: (1) the trial court failed to comply with Rule 431(b) during jury selection; (2) the prosecutor gave an improper argumentative opening statement; (3) the State improperly elicited an opinion from Glasgow concerning the defendant's intent and irrelevant testimony to invoke sympathy for Glasgow's family; (4) the State improperly elicited an opinion from FBI Agent Clark concerning the defendant's intent; (5) the trial court allowed the State to present other-crimes evidence about Stacy Peterson's possible abduction and murder; (6) the eavesdropping recordings contained irrelevant and prejudicial conversations between the defendant and Smith; (7) the trial court prohibited Jesus Padilla from testifying about

37

Smith's reputation for truthfulness; and (8) the prosecutor improperly expressed his personal opinion and invoked the integrity of his office during rebuttal argument.

¶ 117   We addressed two of the defendant's cumulative error issues earlier in this order—the trial court's failure to fully comply with Rule 431(b) and the State's presentation of other-crimes evidence. We will therefore focus primarily on the remaining six issues raised by the defendant in this cumulative error claim.

¶ 118                    1. Propriety of Prosecutor's Opening Statement

¶ 119   The defendant argues that the prosecutor erred in opening statement by emphasizing the defendant's hatred for Glasgow, including using the defendant's own obscenity-laden language. In response, the State claims that the defendant forfeited this issue because he failed to object to the prosecutor's statements and did not include this issue in his posttrial motion. *Enoch*, 122 Ill. 2d at 186; *Denson*, 2014 IL 116231, ¶ 18. The State alternatively argues that the defendant did not establish any error.

¶ 120   Whether the State's opening statement demands reversal of the defendant's conviction and remand for a new trial is an issue reviewed *de novo*. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 23. A new trial should be granted if a prosecutor's improper remarks constituted a material factor in the conviction. *People v. Linscott*, 142 Ill. 2d 22, 28 (1991). The test for reversal is whether "the jury could *** have reached a contrary verdict had the improper remarks not been made," or whether the "reviewing court cannot say that the prosecutor's [improper] comments did not contribute to the defendant's conviction[ ]." (Internal quotation marks omitted.) *Id.*

¶ 121   We begin our analysis of this issue with a brief review of the purpose and acceptable content of an opening statement. An opening statement is intended "to apprise the jury of what each party expects the evidence to prove." *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). "An

opening statement may include a discussion of the expected evidence and reasonable inferences from the evidence." *Id.* The prosecutor is not allowed to make any statement in opening that he or she cannot or does not intend to prove. *Id.* If a prosecutor's comments are the result of deliberate misconduct or result in substantial prejudice to the defendant, the error is reversible. *Id.*

¶ 122　The defendant provides this court with no legal authority for his proposition that the prosecutor's opening statement was inappropriate. From our review of the record, the State's opening statement properly described the chronology of the events, included the evidence it expected to present and how that evidence demonstrated both the defendant's motive and the elements of the charged offenses. While the evidence presented in the State's opening statement did include emphasis on the defendant's hatred for Glasgow, those statements were confirmed with the recordings later introduced into evidence. The evidence included in the opening statement did contain obscenities, but those words were uttered by the defendant and captured on the recordings. "Since the testimony itself was perfectly acceptable, there was no error when the prosecutor referred to it" during opening statement. *People v. Jones*, 153 Ill. 2d 155, 161 (1992).

¶ 123　We agree with the State's position that the defendant has not demonstrated error, much less plain error. In support, we further note that the trial court instructed the jury that opening statements are not evidence. If the opening statement contained any questionable comments, this instruction is intended to lessen any potential prejudicial impact. *Kliner*, 185 Ill. 2d at 128.

¶ 124　　　　　　　　　　2. Propriety of Glasgow's Testimony

¶ 125　The defendant argues that it was improper for Glasgow to: (1) testify that defendant's statements carried the "implication" of killing or murdering him, even though those words were not used, (2) mention that he considered the defendant's statements to reflect a "real threat" because the defendant had "killed before," and (3) comment that the threat upset his family. In

39

response, the State first argues that the defendant forfeited all three of these issues because his attorney did not object to the testimony at issue and did not raise the issue in a posttrial motion. *Enoch*, 122 Ill. 2d at 186; *Denson*, 2014 IL 116231, ¶ 18. Secondly, the State contends that this court cannot review the first alleged error because the error stems from witness answers to questions asked by the defendant's attorney. *People v. Bolla*, 114 Ill. App. 3d 442, 451 (1983).

¶ 126 Illinois Supreme Court and evidentiary rules set the groundwork for the admission of witness testimony. Supreme Court Rule 213(f) sets forth rules for the identity and testimony of witnesses. Ill. S. Ct. R. 213(f) (eff. July 1, 2002). Three types of witnesses are outlined in the rule: lay witnesses, independent expert witnesses, and controlled expert witnesses. *Id.* A "lay witness" is "a person giving only fact or lay opinion testimony." Ill. S. Ct. R. 213(f)(1). Illinois Rule of Evidence 701 governs the admissibility of lay witness testimony. Rule 701 states the following:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 127 We reject the defendant's claim that testimony that the defendant's statements carried the "implication" of killing or murdering him was improper because we find that it was invited error. The challenged testimony was elicited on cross-examination by the defendant's attorney. Glasgow testified that he had reviewed about 15 minutes of the eavesdropping recordings. On cross-examination, the defendant's attorney asked Glasgow whether the defendant had used the words "kill" or "murder." In response, Glasgow acknowledged that the defendant had not used those exact words, but he testified that there was an "implication" to the defendant's comments on the recordings that he had intended to do so. The supreme court has held that regardless of the competency or relevance of the testimony, when the defense cross-examines a witness, the State

40

is not responsible for questions the defense asks or the answers provided in response. See *People v. Burage*, 23 Ill. 2d 280, 282-83 (1961). If the defendant invites potentially prejudicial evidence by cross-examination of a witness, there is no reversible error. *Bolla*, 114 Ill. App. 3d at 451; *People v. Brown*, 116 Ill. App. 2d 228, 231 (1969) (citing *People v. Thigpen*, 33 Ill. 2d 595, 598 (1966)).

¶ 128 We reject the defendant's allegation of error concerning Glasgow's testimony that the threats were taken seriously because the defendant had previously committed murder. We find that the testimony was proper lay witness opinion testimony. As stated earlier in this order, Illinois Rule of Evidence 701 authorizes opinion testimony by a lay witness if the testimony is rationally based on the witness's perception, is helpful to a clear understanding of that testimony, and is not based on scientific, technical, or specialized knowledge. Ill. R. Evid. 701. Glasgow was asked by the prosecutor if he took the defendant's threat seriously. The question was intended to elicit foundational evidence why Glasgow turned the matter over to the Illinois Attorney General's Office after listening to portions of the eavesdropping recordings. Illinois courts have found that testimony about a prior belief is appropriate when offered to explain the course of an investigation and not to provide a current opinion on the defendant's credibility. See *People v. Martin*, 2017 IL App (4th) 150021, ¶¶ 1, 5, 18 , 30-32 (where the State asked a police officer who he believed had been driving the vehicle at the time of the incident, and the answer reflected the officer's previous belief formed at the scene, the court found that the opinion was offered to explain the course of the resulting investigation, and not to disparage the defendant's credibility). Here, Glasgow stated a past belief about the defendant's criminal acts to explain the course of the underlying investigation in this case. We therefore find that the defendant's challenge to this testimony is without merit.

41

¶ 129    Finally, the defendant argues that Glasgow's testimony that the defendant's threat upset his family was improper and served to garner sympathy for the victim and prejudice towards the defendant. The defendant argues that this testimony had no bearing on his guilt or innocence. See *People v. Silva*, 231 Ill. App. 3d 127, 136 (1992). The State asked Glasgow how the defendant's threats made him feel. In response, Glasgow testified that his wife was quite upset over this threat and that his wife's fear was a hardship for him. Testimonial references to a victim's family are not automatically deemed erroneous. *People v. Free*, 94 Ill. 2d 378, 414 (1983). The issue is whether the testimony was elicited in a manner calculated to make it appear material in nature. *Id.* In *Free*, the victim's family was mentioned multiple times in an incidental manner, but the State did not dwell on the topic. *Id*. at 414-15. Similarly, here, Glasgow's family was not portrayed as a material factor. Glasgow mentioned the emotional impact on his family in response to one question. The topic was not referenced in the State's opening statement or in any other questions to Glasgow. We note that the prosecutor did briefly mention the threat to Glasgow and his family during closing argument. The prosecutor told jurors, "He felt that his life could be in danger. He felt that the lives of his family could be in danger. So they treated [the threat] seriously." This comment was not particularly inflammatory, and the subject was not emphasized. We conclude that these references to Glasgow's family did not make the impact of the defendant's threats on them "appear material," and the topic was not "used to inflame the jury." See *Silva*, 231 Ill. App. 3d at 136-37. We thus find no error.

¶ 130                     3. Propriety of FBI Agent Clark's Testimony

¶ 131    The defendant next argues that FBI Agent Clark improperly provided opinion testimony. On the recordings, the jury heard the defendant ask Smith if his uncle "wants ten grand for it." Agent Clark testified that he believed that statement to mean that the defendant was planning to

42

pay $10,000 to have Glasgow killed. The State argues that the issue is forfeited because the defendant did not object to the testimony and did not include this issue in his posttrial motion. *Enoch*, 122 Ill. 2d at 186; *Denson*, 2014 IL 116231, ¶ 18.

¶ 132   We again refer to Supreme Court Rule 701 for the requirements in accepting a lay witness's opinion testimony. That rule authorizes opinion testimony by a lay witness if the testimony is rationally based on the witness's perception, is helpful to a clear understanding of that testimony, and is not based on scientific, technical, or specialized knowledge. Ill. R. Evid. 701. Clark's testimony was extrapolated from the hours of communication between Smith and the defendant. We find that Clark's opinion testimony—essentially that the defendant's use of the term "it" was a reference to Glasgow's intended murder—was proper. The testimony was based on Clark's perception, was helpful to a clear understanding of his testimony as a whole, and was not based on any scientific, technical, or specialized knowledge. It was also connected to Clark's past belief of the defendant's planned criminal activity and was offered to explain the course of the case's investigation. See *Martin*, 2017 IL App (4th) 150021, ¶¶ 30-32 (citing *People v. Hanson*, 238 Ill. 2d at 74, 101 (2010)). Accordingly, we find no error.

¶ 133       4. Admission of Irrelevant and Prejudicial Content in Eavesdropping Recordings

¶ 134   The defendant next argues that he was prejudiced by irrelevant content included in the eavesdropping recordings. First, the State counters that the defendant has forfeited this issue by not raising the issue in his posttrial motion. *Enoch*, 122 Ill. 2d at 186; *Denson*, 2014 IL 116231, ¶ 18. Although the defendant filed a posttrial motion raising issues about content from the recordings, those claims were different from the ones he raises on appeal. Second, the State notes that the defendant asked the trial court to play the full recordings as opposed to the excerpts that were played during trial. Consequently, the State argues that review of these claims is barred by

43

the invited error doctrine, and the defendant should not be allowed to claim on appeal that some portions of the recordings should have been redacted. See *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (holding that the doctrine of invited error bars a defendant from requesting to proceed in one direction at trial only to later argue on appeal that the direction taken at trial constituted error). Third, the State contends that there was no error committed because the evidence was relevant in the sense that the defendant contemplated other criminal activities, and probative value of the evidence was not substantially outweighed by its prejudicial effect.

¶ 135   Irrelevant evidence is typically inadmissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Even if the evidence is relevant, it should not be admitted if its probative value is substantially outweighed by the danger of unfair prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Romanowski*, 2016 IL App (1st) 142360, ¶ 28.

¶ 136   Having reviewed the statements from the recordings, we agree with the defendant that the portions of the recorded conversations played for the jury contained irrelevant information that reflected poorly on the defendant's character. Specifically, those portions of the recordings indicated that (1) the defendant planned to establish an illegal drug business with Smith, (2) he could have seized a gun during his trial for Savio's murder and escaped from custody, (3) he taunted the Illinois State Police, (4) he insulted TV personalities, and (5) he talked about sexual matters, including prior involvement with a prostitute, and told lewd jokes.

¶ 137   The defendant argues that none of this evidence was relevant because the crimes charged were not made more or less probable by this evidence. The State, by contrast, argues that this

evidence was relevant to establishing the character and tendency of the defendant to pursue the alleged agreement with Smith to have Glasgow killed. We find that the State advanced an improper propensity argument. Illinois Rule of Evidence 404(a)(1) provides:

> "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except *** [i]n a criminal case, evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same[.]" Ill. R. Evid. 404(a)(1) (eff. Jan. 1, 2011).

This evidence was improper because it served no purpose other than to frame the defendant in a negative light. However, we agree with the State that the defendant was responsible for inviting the error, and thus cannot be rewarded for doing so. *Harvey*, 322 Ill. 2d at 385. If the jurors had heard the full recordings as the defendant had requested, they would have heard the same irrelevant and potentially damaging information. Accordingly, the issue is barred from consideration.

¶ 138        5. Exclusion of Witness Reputation Testimony From Jesus Padilla

¶ 139   The defendant argues that the trial court erred in prohibiting Jesus Padilla from testifying about Smith's reputation for truthfulness. This proposed testimony would have been based upon his relationship with Smith during the one year that they were both incarcerated at the Menard prison. The State objected on the basis that reputation evidence needed to be based upon a current relationship between Smith and Padilla. The court sustained the objection. In response to the defendant's argument, the State argues that the trial court correctly excluded this reputation testimony because the defendant did not present an adequate foundation for its admission.

¶ 140   "A witness in a criminal case may be impeached by proof of reputation for untruthfulness." *Kliner*, 185 Ill. 2d at 173; see also Ill. R. Evid. 608 (eff. Jan. 6, 2015). In *Kliner*, the supreme court explained the foundational requirement for admission of reputation testimony as follows: "The proper procedure to introduce evidence of truthfulness is to ask the impeaching witness whether he knows the general reputation of the principal witness' truthfulness in the neighborhood in which

45

he lives or amongst those with whom he works or socializes." *Kliner*, 185 Ill. 2d at 173. Furthermore, this type of reputation testimony "must relate to the witness' reputation at the time of trial." *Id.*

¶ 141   The defendant argues that Jesus Padilla's testimony would have been based upon Smith's "general reputation *** [for] truthfulness in the neighborhood in which he lives," and that the reputation testimony did not have to coincide with his reputation at the time of trial. The defendant's argument is based upon the supreme court's discussion of the issue in *Kliner*. However, we disagree with the defendant because his argument does not include the remainder of the supreme court's discussion in which it mandated that the testimony about a witness's reputation must be about his reputation at the time of trial. *Id.* (citing M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 608.3 (6th ed. 1994)). Accordingly, we find that the defendant's argument does not have merit.

¶ 142                                6. Propriety of the State's Rebuttal Argument

¶ 143   The defendant argues that the State's rebuttal argument was improper because the integrity of the state's attorney's office was invoked. The prosecutor argued:

> "And for the defense to sit here and say that this is all just some scheme. You think I've got better stuff to do? Heck, yes, I do. My desk is piling up. I got another jury trial coming up in two weeks on a case about burglary that I'm not going to lie to you, I care more about that than I care about that man right there. I've got a rape case I've got to try this summer. And for them to implicate that this is all just some scheme and we're all just obsessed with Drew Peterson. This is where we get back to that common sense, ladies and gentlemen. Use your common sense."

The defendant contends that the prosecutor was inferring through this statement that the defendant was guilty because otherwise the prosecutor could have been working on his other cases.

¶ 144   In response, the State argues that the defendant has forfeited this argument because his attorney did not object contemporaneously and did not raise the issue in his posttrial motion.

46

*Enoch*, 122 Ill. 2d at 186; *Denson*, 2014 IL 116231, ¶ 18. Alternatively, the State contends that the issue is without merit because the prosecutor's statement was in direct response to defense counsel's closing argument and, thus, was "provoked or invited" argument. See *People v. Glasper*, 234 Ill. 2d 173, 204 (2009) (citing *People v. Kirchner*, 194 Ill. 2d 502, 553 (2000)). During the closing argument, the defense attorney argued that the State's case was "questionable" because there was no physical evidence and because the defendant did not use the words "kill" or "murder." Additionally, the defendant's attorney suggested that the State utilized other-crimes evidence and the disappearance of Stacy to get "everybody riled up" to cover for the lack of evidence against the defendant.

¶ 145   In closing argument, prosecutors are allowed wide latitude and "may argue facts and reasonable inferences drawn from the evidence." *People v. Branch*, 2017 IL App (5th) 130220, ¶ 16 (citing *People v. Williams*, 192 Ill. 2d 548, 573 (2000)). Prosecutors are not allowed to "engage in argument that serves no purpose other [than] to inflame the passions of the jury." *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 51 (citing *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005)).

¶ 146   We find that the defendant has forfeited this issue, but even if he had not forfeited the issue, the State's rebuttal argument was appropriate to respond to defense counsel's argument questioning the State's actual intention in prosecuting the defendant.

¶ 147                              7. Cumulative Error

¶ 148   The defendant asserts that all errors he alleges had the cumulative effect of depriving him of a fair trial. In reviewing a cumulative error claim, the court uses the same analysis we use for second-prong plain error analysis—we determine whether the defendant's trial was so

47

fundamentally unfair that the "errors created a pervasive pattern of unfair prejudice to defendant's case." *Blue*, 189 Ill. 2d at 139.

¶ 149   Having reviewed the briefs and arguments of counsel, the record on appeal, and all relevant law, we reject the defendant's cumulative error claim. The claims in this case were either inherently lacking in error or were arguments in which the error in question was not subject to plain error review; thus, they do not merit reversal. See *People v. Hall*, 194 Ill. 2d 305, 350-51 (2000).

¶ 150   The State argues that only one of the arguments was preserved for appeal (the "other-crimes evidence argument" concerning Stacy's disappearance or murder). However, the forfeiture doctrine is a limitation on the parties, not on the court. See, *e.g.*, *Blue*, 189 Ill. 2d at 138 (declining to apply the forfeiture doctrine and addressing the merits of the defendant's arguments to protect the defendant's interest in receiving a fair trial). The court may still choose to address all other claims. *Id.*

¶ 151   In addressing the merits of the defendant's arguments, the merits of the above "errors" are not enough alone or together to warrant reversal. Only one of the errors in this cumulative error analysis was preserved, and the remainder involved either no error or invited error. The sole error which survives is the Supreme Court Rule 431(b) error which will not stand alone under a second-prong plain error analysis. *Sebby*, 2017 IL 119445, ¶ 52. Reversal is therefore not warranted as there is no cumulative error. See *Blue*, 189 Ill. 2d at 138.

¶ 152                                    III. CONCLUSION

¶ 153   For the foregoing reasons, we affirm the conviction and sentence of the Randolph County circuit court.

¶ 154   Affirmed.